OPINION OF THE COURT
Wachtler, J.
The Trump-Equitable Fifth Avenue Company (Trump), which seeks a partial tax exemption in this proceeding, is a joint venture which owns a parcel of real property located at 721-725 Fifth Avenue in Manhattan. Before Trump acquired the property, the site was improved with a 12-story structure used as a retail department store owned and occupied by Bonwit Teller & Company. Trump demolished the building and is in the process of replacing it with Trump Tower, a 59-story structure to consist of 18 floors of retail and commercial office space to be retained by Trump, and 38 residential floors housing 266 luxury condominium units. The condominium units are to be sold for a sum of $155 million in prices which range from $407,000 to $3,150,000.
*592 Trump applied to the New York City Department of Housing Preservation and Development (HPD) for a partial tax exemption for the 38 residential floors pursuant to section 421 (now 421-a)[1] of the Real Property Tax Law, subdivision 1 of which provided in part, as originally enacted: “To be eligible for exemption under this section such construction shall take place on vacant, predominantly vacant or under-utilized land, or on land improved with a non-conforming use”.[2] HPD denied Trump’s application on the ground that “on the operative date, the site was [not] occupied by a functionally obsolete non-residential or residential building”. The “functional obsoleteness” standard has its source not in the legislation but in HPD Regulation No. 4, which requires that in order to be eligible for the exemption the subject property must have been vacant, predominantly vacant or under-utilized on October 1, 1971. The regulation defines under-utilized land as “land or space which was substantially under-utilized by virtue of the fact that * * * [i]t is occupied by functionally obsolete non-residential or residential buildings.”
Special Term vacated respondent commissioner’s denial of Trump’s application as arbitrary and capricious and in *593 excess of his authority, essentially on the ground that the regulation requiring “functional obsoleteness” was invalid. The court then determined that the subject parcel was “under-utilized” within the meaning of the statute as of October 1, 1971, and ordered respondent to grant Trump’s application for the partial tax exemption.
The Appellate Division reversed the order of Special Term, reinstated respondent’s determination, and dismissed the petition. The court found it unnecessary to consider whether respondent’s definition of under-utilization in terms of “functional obsoletenéss” constituted an unwarranted extension of the meaning of the statute in light of its own determination that the subject property was, as of October 1, 1971, not under-utilized “in any ordinary understanding of the term” or “as a practical matter”. (87 AD2d, at p 16.) In our view the Appellate Division erred in not vacating an agency determination expressly based upon an administrative regulation clearly inconsistent with the plain words of the governing statute. We therefore reverse.
A fundamental principle of administrative law long accepted by this court limits judicial review of an administrative determination solely to the grounds invoked by the agency, and if those grounds are insufficient or improper, the court is powerless to sanction the determination by substituting what it deems a more appropriate or proper basis (Matter of Montauk Improvement v Proccacino, 41 NY2d 913; Matter of Barry v O’Connell, 303 NY 46; see, also, Securities Comm. v Chenery Corp., 332 US 194).
In denying Trump’s exemption application HPD did not rely on the statutory concept of under-utilization except insofar as that concept was redefined by the functional obsoleteness standard embodied in its own regulations. The Appellate Division acknowledged that respondent’s determination was premised on Trump’s failure to establish that the subject property was occupied by a functionally obsolete structure on the operative date. That court determined, however, that it was unnecessary to consider *594 whether the functional obsoleteness requirement was inconsistent with the statutory concept of under-utilization, for it found that the property was not under-utilized “in any ordinary understanding of the term” and that the agency determination therefore had a rational basis and was not subject to vacatur. Thus, in failing to review HPD’s denial of the partial tax exemption on the specific ground invoked by the agency and in substituting its own independent rationalization for upholding the agency’s determination, the Appellate Division exceeded the appropriate boundary of judicial review in this area (Matter of Montauk Improvement v Proccacino, supra; Matter of Barry v O’Connell, supra; Securities Comm. v Chenery Corp., supra).
In reviewing the legality of the basis upon which HPD acted we note that section 421-a requires only that the subject land be “under-utilized” in order to qualify for the partial tax exemption. HPD Regulation No. 4, however, defines “under-utilized land” as property “substantially under-utilized by virtue of the fact that * * * [i]t is occupied by functionally obsolete non-residential or residential buildings”. In our view, the regulation substitutes requirements as preconditions to obtaining the exemption not found in this statute itself. Section 421-a does not require “substantial” under-utilization, nor does the provision imply that only one specific type of under-utilization may qualify property for the exemption. In addition the statute focuses on under-utilization of the land; the regulation focuses on obsoleteness of the buildings. Had the Legislature intended to limit the availability of the exemption solely to property under-utilized by virtue of the presence of functionally obsolete structures, it could have done so through appropriately worded legislation. By requiring functional obsoleteness of the building then, the regulation improperly limits the availability of the exemption to one category of under-utilized land in direct contravention of the plain words of the statute.[3]
*595 It is well established that in exercising its rule-making authority an administrative agency cannot extend the meaning of the statutory language to apply to situations not intended to be embraced within the statute (Matter of Jones v Berman, 37 NY2d 42). Nor may an agency promulgate a rule out of harmony with or inconsistent with the plain meaning of the statutory language (Finger Lakes Racing Assn. v New York State Racing & Wagering Bd., 45 NY2d 471; Matter of Harbolic v Berger, 43 NY2d 102). Applying these settled principles, we conclude that by substituting a requirement not specified in section 421-a, the definition of “under-utilized land” found in HPD Regulation No. 4 is invalid.
Application of principles of statutory construction supports our conclusion. Under the maxim noscitur a sociis, the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it. This maxim expresses the rule of construction that the words used in a statute are construed in connection with, and their meaning is ascertained with reference to, the words and phrases with which they are associated (McKinney’s Cons Laws of NY, Book 1, Statutes, § 239, subd a). Applying this principle here, the meaning of the statutory term “under-utilized” is determined by reference to the two preceding terms “vacant” and “predominantly vacant”. Although we leave proper ascertainment of the meaning of “under-utilized” to the administering agency after its reconsideration on remittitur,[4] we observe that reference to the statutory terms “vacant” and “predominantly vacant” precludes any definition of under-utilization which incorporates a requirement that the subject property hold a structure which is functionally obsolete.
*596 Respondent contends, in favor of affirmance, that the legislative history of section 421-a suggests that the provision is designed to facilitate the development of affordable middle and lower income housing units as opposed to the expensive, luxurious apartments of Trump Tower. This is unpersuasive for a variety of reasons.
First, it is not at all clear that the legislative history of the statute is as respondent contends. Although a statement to that effect appears in a 1978 research compilation (Ford, Housing Policy: The Urban Middle Class [1978], at p 54) the statement is unsupported by any citation to relevant authority. Also, research compilations prepared years after a statutory enactment are not relevant in determining the legislative intent behind the statute (see Matter of Delmar Box Co. [Aetna Ins. Co.], 309 NY 60, 67). Moreover, the only official legislative history of section 421-a, the Memorandum of the Legislative Representative of the City of New York, speaks only in terms of housing shortages and new construction in general. Nothing contained in the memorandum in any way implies that the statute was designed to stimulate the development of middle income housing.[5]
Second, even if the legislative history of the statute were as respondent contends our conclusion would in no way be affected since the proposed construction of section 421-a contravenes the mandate and the express language of the *597 statute itself, which in no way attempts to limit the availability of the exemption to the development of middle income housing units. This court should not ignore the words of a statute, clear on its face, to reach a contrary result through judicial interpretation (McKinney’s Cons Law of NY, Book 1, Statutes, § 76; Matter of Kleefeld, 55 NY2d 253, 259).
Respondent also contends that HPD Regulation No. 4 constitutes an interpretation of a statute by an administering agency and is therefore entitled to great weight and judicial deference. As a general matter courts should defer to the interpretation given a statute by the agency charged with its enforcement if the interpretation is neither irrational, unreasonable, nor inconsistent with the governing statute (Matter of Fineway Supermarkets v State Liq. Auth., 48 NY2d 464; Matter of Sigety v Ingraham, 29 NY2d 110). Where, however, as in the instant case, the words of the statute are clear and the question simply involves the proper application of the provision “there is little basis to rely on any special competence or expertise of the administrative agency arid its interpretive regulations”, especially when the interpretation, as embodied in a regulation, directly contravenes the plain words of the statute (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459).
Accordingly, the order of the Appellate Division should be reversed, the determination of respondent Commissioner for the Department of Housing Preservation and Development of the City of New York vacated, and the matter remanded to respondent for reconsideration of petitioner’s application, and, if deemed appropriate, the promulgation of regulations appropriate to the application of the legislatively prescribed standard of “under-utilized land”.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Fuchsberg and Meyer concur.
Order reversed, with costs, determination of respondent commissioner vacated and matter remitted to Supreme *598 Court, New York County, with directions to remand to the respondent commissioner for further proceedings in accordance with the opinion herein.

. As originally enacted, subdivision 1 of the statute provided a partial declining exemption from real property taxes as follows: “(1) New multiple dwellings within a city having a population of one million or more * * * shall be exempt from taxation for local purposes, other than assessments for local improvements, during construction and so long as used for dwelling purposes for a period not to exceed ten years in the aggregate after the taxable status date immediately following the completion thereof, consisting of two years of full exemption followed by two years of exemption from eighty per cent of such taxation, followed by two years of exemption from sixty per cent of such taxation, followed by two years of exemption from forty per cent of such taxation, followed by two years of exemption from twenty per cent of such taxation; provided that taxes shall be paid during any such period at least in the amount of the taxes paid on such land and any improvements thereon during the tax year preceding the commencement of such construction and that exemption from taxes shall not be "availed of concurrently under any other law” (L 1971, ch 1207, § 1). The provision has recently been amended and now appears in section 421-a (subd 2, par [a]) of the Real Property Tax Law (L 1981, ch 995, § 1). It should be noted that the provision was drafted to assure that the partial exemption resulted in no loss of tax revenue to the municipality over a period of time because the exempt property would always be subject, at a minimum, to the amount of taxes paid on the property prior to the grant of the exemption.

. The provision in question has recently been amended and appears in section 421-a (subd 2, par [d]) of the Real Property Tax Law as follows: “To be eligible for exemption under this section such construction shall take place on land which, thirty-six months prior to the commencement of such construction, was vacant, predominantly vacant, under-utilized, or improved with a non-conforming use” (L 1981, ch 995, § 1).

. It is useful for purposes of analysis to consider the hypothetical employed by Special Term to emphasize the inconsistency between the statute and the regulation: “For example, if a prime Manhattan site which could conceivably, consistent with zoning *595 limitations, house a forty story residential tower and instead housed a perfectly viable and newly constructed two story parking garage, there could be little doubt that the site would be ‘under-utilized land’, within any reasonable interpretation of the term, regardless of whether or not the garage was functionally obsolete”.

. We would note in this regard that we in no way approve of or adopt Trump’s contention that “under-utilized land” is property not developed to the most productive state or maximum potential permitted under applicable zoning regulations. More appropriate perhaps is Special Term’s formulation of the statutory concept as property “used in such manner that substantially less beneficial use was made of the land than was possible under the circumstances”.

. The memorandum’s “Reasons for support” reads in its entirety as follows: “The housing shortage afflicting the municipalities of this State is greatly exacerbated by the virtual cessation of new construction. Similar conditions a half century ago caused the State Legislature to authorize local laws granting tax exemption to new units for a brief period (Laws of 1920, Chapter 949). This program acted as a tremendous stimulus to new construction.
“The bill would channel the tax benefits to areas in the City of New York where the creation of new units would cause minimal displacement and would require that the tax benefits be reflected in a lowering of rents.
“No efforts should be spared to increase the number of safe and decent dwelling units in our cites. Under this bill, the City would not actually lose tax revenues since the owner would continue to pay during the period of the exemption the amount of prior taxes on the property, and future tax yields would be greatly enhanced by the improvements.
“Accordingly, the Mayor urges upon the Legislature the earliest possible favorable consideration of this proposal”. (Memorandum of Legislative Representative of City of New York, McKinney’s Session Laws of NY, 1971, at p 2551.)