OPINION OF THE COURT
Kaye, J.
This appeal calls upon us to review, once again, applicability of section 421-a of the Real Property Tax Law, providing a partial exemption from local real property taxes for new multiple dwellings constructed on underutilized land, to Trump Tower, a 59-story structure in Manhattan consisting of commercial space and 38 floors of luxury residential condominium units. Application of the statute hinges on the term “under-utilized land”: only if, on October 1,1971, the land formerly occupied by the Bonwit *542 Teller & Company department store was under-utilized is appellant, successor to that space, eligible for the tax benefit on its residential units.
Respondent, Commissioner of the Department of Housing Preservation and Development (HPD), has twice denied the exemption, concluding for different reasons that the land was not under-utilized; twice Special Term has set aside that determination; and twice the Appellate Division has reversed Special Term and upheld respondent. Respondent initially denied Trump’s application, in March, 1981, on the ground that “on the operative date, the site was [not] occupied by a functionally obsolete non-residential or residential building.” This court in Matter of Trump-Equitable Fifth Ave. Co. v Gliedman (57 NY2d 588) reversed the order of the Appellate Division upholding that determination, because respondent by requiring functional obsoleteness of the building had established a precondition to the exemption not found in the statute, and we directed that the matter be remitted to HPD for reconsideration and, if deemed appropriate, new regulations defining under-utilized land. Respondent, in April, 1983, a second time denied the exemption on the ground that the land was not under-utilized, first pursuant to interpretation of the statute and, alternatively, pursuant to new regulations. Because we conclude that the agency again has impermis-sibly erected a barrier to the benefit provided by the Legislature, we reverse the order of the Appellate Division and reinstate the order and judgment of Supreme Court, New York County, allowing the exemption.
When appellant initially filed its application in December, 1980, section 421-a of the Real Property Tax Law provided a partial exemption from local taxes for newly constructed multiple dwellings as follows: “To be eligible for exemption under this section such construction shall take place on vacant, predominantly vacant or underutilized land, or on land improved with a non-conforming use * * * where construction is commenced after December thirty-first, nineteen hundred seventy-two, eligibility shall be determined on the basis of the condition of the land on the first day of October, nineteen hundred seventy-one.”
As revealed in the Memorandum of the Legislative Representative of the City of New York, the only official *543 legislative history of this section, the purpose of the statute, passed in 1971, was to spur new construction of multiple dwellings to meet a housing shortage afflicting the municipalities of the State. (McKinney’s Session Laws of NY, 1971, at p 2551.) “No efforts should be spared to increase the number of safe and decent dwelling units in our cities.” (Id.) While inducing construction of residences through the tax incentive, the statute was drafted to assure that municipalities would not actually lose tax revenues during the 10-year abatement period. As the New York City Legislative Representative explained: “Under this bill, the City would not actually lose tax revenues since the owner would continue to pay during the period of the exemption the amount of prior taxes on the property, and future tax yields would be greatly enhanced by the improvements.” (McKinney’s Session Laws of NY, 1971, at p 2551.) The Legislature did not choose to restrict availability of this exemption to construction of low- and middle-income housing. Thus, it is immaterial that luxury housing is in issue. (Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 57 NY2d 588, 596, supra.)
No definition of the key phrase “under-utilized land” is set forth in the statute. HPD initially defined “underutilized land” in its regulations by a standard of functional obsoleteness of the building occupying the site in question. Under-utilized land was said to be “land or space which was substantially under-utilized by virtue of the fact that * * * [fit is occupied by functionally obsolete non-residential or residential buildings.” The 12-story structure housing Bonwit’s, which continued to function until 1978, generating millions of dollars in annual revenues from the operation of a department store, was not functionally obsolete, and the exemption was therefore denied. In reversing the denial of the exemption, this court held that by a requirement of functional obsoleteness of the building HPD had improperly limited availability of the exemption to one category of under-utilized land, in direct contravention of the plain words of the statute. While we left for HPD the proper ascertainment of the meaning of “under-utilized,” we noted disapproval of appellant’s contention that it is property not developed to the most productive state or *544 maximum potential permitted under applicable zoning regulations. “More appropriate perhaps is Special Term’s formulation of the statutory concept as property ‘used in such manner that substantially less beneficial use was made of the land than was possible under the circumstances’”. (57 NY2d 588, 595, n 4.) Although cited by respondent, this suggested concept has not been actually incorporated in the result reached upon reconsideration.
On remittal, respondent has again reached his earlier conclusion, but on different grounds. First, respondent interpreted the statute “as guided by the decisions of the courts and the legislative history” and second, respondent applied standards contained in regulations issued in November, 1982.[1]
Respondent concluded that the 12-story department store building was not out of character with the area, where the average height of department stores was 9.1 stories, that the structure used approximately 66% of its potential floor area ratio, and that the actual square foot usage of the building was equal to 93% of the maximum potential residential use of the site (although no residential use was made of the site). While economic considerations, such as the submission that Bonwit’s was losing money, were not “ultimately conclusive,” HPD took into account that the building produced revenues of $30 million. That the assessed value of the building was roughly half that of the land, and was subsequently even further reduced in a certiorari proceeding, might indicate that the land was not developed to its highest and best use but did not, in respondent’s view, establish under-utilization, and *545 in any event would be matched in ratio by virtually every department store in the Fifth Avenue area. Finally, regarding the condition of the building, respondent concluded that the data did not demonstrate it could not be used as a department store. Appellant’s two equitable arguments were rejected: that it had been induced by city officials to make Trump Tower partially residential instead of solely commercial by availability of the exemption, and that other similar sites in the area had received the 421-a exemption, none being denied on grounds that the land was not under-utilized.
Interpretation given a statute by the agency charged with its enforcement is, as a general matter, given great weight and judicial deference, so long as the interpretation is neither irrational, unreasonable nor inconsistent with the governing statute. (Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 57 NY2d 588, 597, supra.) Nevertheless, where as in the instant case “the words of the statute are clear and the question simply involves the proper application of the provision ‘there is little basis to rely on any special competence or expertise of the administrative agency and its interpretative regulations’, especially when the interpretation, as embodied in a regulation, directly contravenes the plain words of the statute (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459).” (Id.)
Section 421-a requires only “under-utilization” of the land. As we have previously held, the statute does not require “substantial” under-utilization (Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 57 NY2d 588, 594, supra).[2] Both in respondent’s abstract interpretation of the statute and in HPD’s regulation, substantial under-utilization has been imposed as a precondition to the statutory benefit. This respondent cannot do.
Three objective criteria were central to respondent’s analysis of the utilization of the site under the circumstances: the actual-built floor area ratio against the permissible floor area ratio under the zoning regulation as of *546 October, 1971; the actual square footage developed by the non-residential structure against the maximum square footage allowable; and the assessed value of the building against that of the land. On October 1, 1971, only 66% of the permissible floor area ratio, and only 60-62% of the square footage available to the store, for non-residential usage, were actually employed by Bon wit’s.[3] The conclusion that 60-66% usage of the land was not under-utilization could only be reached by a standard of substantial under-uti'lization, not required by the statute or its legislative history. Similarly, in 1971, the assessed value of the building was reduced to $1,800,000 as against $4,400,000 for the land, and the land assessment multiplied to $13,000,000 after demolition of the building. While respondent observed that the land-to-building ratio was not atypical along Fifth Avenue, the fact that it might also be available to others would not be a proper basis on which to withhold an exemption as fashioned by the Legislature.
HPD’s regulations suffer from the same infirmity: they improperly add a requirement not found in the statute. (See Matter of Cady [Aetna Life & Cas. Co. — Lewis], 61 NY2d 594; Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 57 NY2d 588, 597, supra; Finger Lakes Racing Assn. v New York State Racing & Wagering Bd., 45 NY2d 471, 480-481; Matter of Harbolic v Berger, 43 NY2d 102; Ostrer v Schenck, 41 NY2d 782.) The regulations are premised on the statement that under-utilized land is “land or space which was substantially under-utilized.” While respondent notes that the actual analysis does not rely on the word “substantial” in the regulations, it is clear from a reading of the regulations that they in fact embody a concept of substantial under-utilization. Eligibility is dependent on location in a zoning district where the maximum floor area ratio for non-residential buildings is 20% or less of the maximum for residential buildings, or assessed building valuation of 20% or less of assessed land valuation, or obsolescence of the building by reason of design or structural defects. Such stringent eligibility re *547 quirements are difficult to reconcile with a statute that requires only that the land be “under-utilized.”
Respondent’s interpretation, by imposing a requirement of substantial under-utilization, thus is inconsistent with the governing statute. Whatever definition respondent may for the future give “under-utilized land,” short of more detailed definition of the term by the Legislature, on the extensive record accumulated by the parties before us the objective criteria establish that the Bonwit’s site was under-utilized, and that appellant is entitled to the exemption. We therefore reverse the order of the Appellate Division, with costs, and reinstate the order and judgment of Supreme Court, New York County.
Chief Judge Cooke and Judges Jasen, Jones, Wacht-ler, Meyer and Simons concur.
Order reversed, etc.

. In pertinent part the regulations provide:
“Section 2.5 Site Requirement
“(3) For the purpose of this section the following definitions are applicable: * * *
“(c) ‘Under-utilized’ land is land or space which was substantially under-utilized by virtue of the fact that: * * *
“(iii) It was improved with a non-residential building or buildings (a) each of which contained no more than (i) the permissible floor area ratio for non-residential buildings in the zoning district in question and (ii) was located in a zoning district where the maximum FAR for non-residential buildings is 20% or less of the maximum FAR for residential buildings, or (b) each of which had an assessed valuation equal to or less than twenty percent of the assessed valuation of the land on which the building or buildings were situated, or (c) which, by reason of the building’s configuration, or substantial structural defects not brought about by deferred maintenance practices or intentional conduct, could no longer be functionally or economically utilized, on the operative date, in the capacity in which it was formerly utilized.”

. While, as we have previously held, eligibility for the exemption requires only under-utilization in the actual use of land (57 NY2d, at p 594), one suggested measure of under-utilization would be whether substantially less beneficial use was made of the land than was possible under the circumstances. (57 NY2d, at p 594, n 4.)

. Appellant claims that both figures are overstated — that only about 52% of the maximum floor area was in use, and that the site could have supported a structure with square footage many times that of the square footage actually used.