In the Matter of GILBERT TILLES et al., Appellants, v HENRY G. WILLIAMS, as Commissioner of the New York State Department of Environmental Conservation, et al., Respondents.

Second Department, September 8, 1986

### APPEARANCES OF COUNSEL

*Stroock & Stroock & Lavan (Charles G. Moerdler, Jed Ringel* and *David A. Stein* of counsel), for appellants.

*Robert Abrams, Attorney-General (Peter H. Schiff, Douglas H. Ward* and *James M. Zaccaria* of counsel), for respondents.

### OPINION OF THE COURT

EIBER, J.

The issue presented for our consideration on this appeal is whether substantial evidence supported a determination that various ponds situated on property owned by the petitioners constituted freshwater wetlands of "unusual local importance" pursuant to ECL 24-0301 (1). We answer this question in the negative and, therefore, reverse the judgment of Special Term which dismissed the proceeding commenced by petitioners, annul the determination under review, and direct the respondents to remove the petitioners' property from the final freshwater wetlands map promulgated on July 30, 1984.

On July 30, 1984, the respondents New York State Department of Environmental Conservation (hereinafter DEC) and the Commissioner of the DEC, after conducting an investigation and public hearing, determined that certain ponds located on property owned by the petitioners constituted wetlands of "unusual local importance" pursuant to ECL 24-0301 (1) (a). Recognizing that such a determination subjected the property

to substantial land-use restrictions and thereby prevented full commercial development of the property, the petitioners commenced the instant proceeding to review the respondents' determination to include portions of said property on the final freshwater wetlands map which was promulgated by the respondent Commissioner. By verified petition dated November 26, 1984, the petitioners requested a judgment directing the respondents to remove the subject property from this map so that the petitioners could finally consummate plans to commercially develop the property. Special Term, however, sustained the respondents' determination and dismissed the petition. This appeal ensued.

The property in question is an unimproved 81-acre tract located at the intersection of Jericho Turnpike and Route 107 which are two principal routes in the Town of Oyster Bay, Nassau County. Situated upon the property are 11 areas of ponded water, each of which is less than 12.4 acres. Although the subject property is currently vacant, it is located in an area ideally suited for the construction of housing and is surrounded by residential communities as well as various commercial enterprises. All efforts to develop this property have been successfully resisted by the residents of neighboring communities.

Commencing in 1981, and continuing through 1984, the DEC received several letters and communications from individuals who reside in the communities which adjoin the subject property as well as from various environmental conservation organizations, requesting that the petitioners' premises, or portions thereof, be designated wetlands of "unusual local importance" (ECL 24-0301 [1] [a]).

The DEC, pursuant to ECL 24-0101 *et seq.,* is empowered to conduct studies to identify and map those individual freshwater wetlands in the State which "if less than twelve and four-tenths acres, (a) have, in the discretion of the commissioner * * * unusual local importance for one or more of the specific benefits set forth in subdivision seven of section 24-0105" (ECL 24-0301 [1]). Regulations promulgated pursuant to ECL article 24 provide that the Commissioner shall designate an area of land and/or water of less than 12.4 acres as a wetland having unusual local importance if, *inter alia,* "[i]t is resident habitat of an endangered or threatened animal species" *(see,* 6 NYCRR 664.5 [a] [2]) or, if it "is hydraulically connected to an aquifer which is used for public water supply" *(see,* 6 NYCRR 664.5 [a] [6]). It was alleged by those who sought to have the

petitioners' property designated a freshwater wetland, that the ponds were deserving of protection because they were the breeding site of the Eastern Tiger Salamander, a species of salamander that this State recently had identified as endangered. It was further alleged that the wetlands on the petitioners' property were part of a critical watershed region in north-central Nassau County and served the important function of recharging clean water to existing aquifers which ultimately provided a major source of drinking water for public consumption.

On April 5, 1984, a public hearing was conducted regarding the inclusion of the petitioners' property on the freshwater wetlands map. The proponents of the designation cited the presence of a newly hatched Tiger Salamander larva and the remains of a hatched egg mass in one of the vernal ponds located on the petitioners' property, as support for the conclusion that the property was indeed a resident habitat of this endangered species. The report relied upon by the proponents specifically stated, however: "More field work needs to be done to determine the size and status of this population and to determine which ponds are being used for breeding sites [on petitioners' property] *but it should be assumed* that all of the ten ponds on the site *are at least potential breeding habitats* for the Tiger Salamander because they are similar in size and configuration, are located close together, and have different, varying water levels which render some of them unuseable during drought years" (emphasis supplied).

In response to these allegations, the petitioners enlisted the services of a consulting firm which specializes in inland and tidal wetland evaluation, to conduct an independent investigation regarding the presence of the Eastern Tiger Salamander within the ponds on the petitioners' property. The conclusions rendered by a biologist from that firm directly refuted the assertions contained in the submissions of those who favored the designation of the property as freshwater wetlands. Indeed, the biologist, after physically inspecting the property, concluded that the ponds which were alleged to be the breeding site of the Eastern Tiger Salamander, contained various species of fish which could not live compatibly with a salamander population. Moreover, the onsite inspection proved unsuccessful in terms of recovering any salamander egg masses and/or larva. The petitioners' biologist further indicated that the single larva referred to by the proponents of the designation had died before maturing, and it was suspected that the

use of pesticides in connection with orchard crops on adjoining properties had greatly contributed to the elimination of this salamander species within the area. The petitioners' biologist also challenged the reliability of the identification of the larva as that of an Eastern Tiger Salamander. He explained, in essence, that at the larval stage of development, the similarities in body characteristics with sister species of salamander render any purported identification tenuous, at best.

With respect to the watershed characteristics of the property, the proponents of the designation proceeded on the theory that the pounds were hydraulically connected to an aquifer. In this regard, a report submitted by the individual who had initially nominated the ponds for designation as freshwater wetlands, revealed that: "The water in these ponds is not directly connected to the Upper Glacial Aquifer; rather it is perched above the water table upon one or more clay-rich sedimentary layers * * * [T]he ponds behave basically as basins, filling with precipitation and drying through surface evaporation, with little subsurface seepage * * * [M]ost are underlain by clay-rich sedimentary layers that are somewhat impervious to water, unlike the soils over the uplands, which are sandy and readily transmit precipitation to the underlying aquifers".

In rebuttal, the petitioners submitted the testimony of a groundwater geologist who was retained to examine the hydrogeological issues relating to the proposed development of the subject property. He stated that the impact of construction and commercial development would not be adverse to and would not result in "degradation of groundwater quality in excess of any pertinent drinking-water standards, provided that sanitary sewers are utilized". His investigations further revealed that the petitioners' property contained perched water zones which were "characteristically discontinuous and of small areal extent * * * Some of the keetle-hole ponds may be part of a perched water-table system, and others may hold water simply because of low-permeability bottom sediments". He additionally indicated that water recharge entering beneath petitioners' property would have a "long travel path" before filtering through and reaching the main aquifer zone. In sum, this expert expressed grave doubts as to whether the proposed development of the subject property would have more than a minimal effect on the quality of groundwater within the town, county or State.

Despite the existence of these diametrically conflicting con-

clusions, the respondents accepted both of the theories advanced by the proponents of the designation, without offering reasons therefor.

Special Term, however, concluded that the allegation that the subject ponds were a resident habitat or, at least, a potential breeding site for the endangered Eastern Tiger Salamander, solely because of the alleged discovery of a salamander larva, more than two years prior to the establishment of the final map, was insufficient to justify the designation of all of the ponds on petitioners' property as freshwater wetlands of "unusual local importance". With respect to the contention that the ponds on the petitioners' property were hydraulically connected to an aquifer used for public water supply, the court held that "a review of respondents' own evidence undermines the aquifer theory. Their own experts have conceded that the ponds are underlain by 'clay-rich sedimentary layers or lenses' that are 'less pervious' than the surrounding areas, 'which are sandy and readily transmit precipitation [sic] to the underlying aquifers'. Such concessions can hardly be viewed as affording a reasonable foundation for a determination that the ponds are wetlands that are 'hydraulically connected' to an aquifer" (see, 6 NYCRR 664.6 [d] [4]).

In sustaining the respondents' determination, Special Term, instead, relied on postdesignation evidence submitted by an employee of the DEC, to the effect that the petitioners' ponds served an important and significant water recharge function in that they capture and collect water which is discharged from surrounding upland areas. This water then fills up and ultimately overflows the banks of the ponds. As a consequence, the excess water percolates and infiltrates into the ground below and clean water is thereby restored to the existing aquifers.

The petitioners had attempted to rebut this newly advanced theory by submitting extensive evidence that due to the high permeability of the soil in the nonponded areas, there was, contrary to the findings of the DEC, a minimal amount of runoff water discharged into the petitioners' ponds. The petitioners' hydrogeological consultant further hypothesized that by reason of the fact that the petitioners' ponds were lined with impervious clay, an inconsequential amount of water was recharged to the underground aquifer, since the impervious material "function[ed] much like a plug and cause[d] water to collect in the ponds and evaporate, rather than drain through the ground to the aquifer". He, therefore, concluded that the

objectives of the DEC regulations would better be served by the removal of the ponds. Additional evidence had been adduced by the petitioners that all ponds serve some recharge function and that ground water supplies would actually be enhanced rather than diminished if the ponds were indeed removed.

On appeal, the petitioners claim, *inter alia,* that Special Term improperly upheld the respondents' determination on the basis of postdesignation submissions which should not have been considered. We agree.

As support for its decision to dismiss the petition, Special Term relied exclusively upon the theory that the petitioners' ponds permitted the percolation of clean water into existing aquifers and were, therefore, subject to the provisions of the Environmental Conservation Law. During the course of administrative proceedings, however, as previously indicated, the proponents of the designation of the property as freshwater wetlands proffered two unrelated theories as justification for their position. They maintained that the ponds were the resident habitat of the Eastern Tiger Salamander, a species which is considered endangered in New York State *(see,* 6 NYCRR 182.6 [a] [4]), and that the ponds were "hydraulically connected to an aquifer" *(see,* 6 NYCRR 664.5 [a] [6]; [b] [13]; 6 NYCRR 664.6 [d] [4]). The hypothesis that the ponds effectively recharged the water supply by collecting water which was discharged from upland areas and by percolating the overflow into underlying aquifers was first propounded by an employee of the DEC in opposition to the instant petition for relief pursuant to CPLR article 78. This theory was never raised for consideration at the administrative level, nor otherwise mentioned until the instant proceeding was initiated. However, we note, as a threshold matter, that Special Term did properly reject the theories that had been raised before the administrative agency.

With regard to the contention that the ponds were inhabited by the endangered Eastern Tiger Salamander, the petitioners correctly assert that pursuant to ECL 24-0301, the respondents were mandated to separately analyze *"individual* freshwater wetlands * * * [of] less than [12.4] acres" (emphasis added) to determine whether each pond possessed traits of "unusual local importance". The present record is devoid of evidence that the DEC analyzed each pond individually, to determine whether each supported a salamander population. Special Term, cognizant of this deficiency in proof, properly

held that the discovery of a salamander larva in one of the ponds could not fairly support a determination that all of the ponds were proper candidates for designation as freshwater wetlands of unusual local importance *(see,* ECL 24-0301 [1]).

It is also of great significance that the individual who had initially nominated the ponds for designation alleged in his report that "[m]ore field work needs to be done to determine the size and status of [the] population and to determine *which ponds are being used for breeding sites"* (emphasis added). Again, it merits emphasis that in the record now before us, there is no evidence that further inspections were conducted to ascertain which individual ponds could be considered breeding sites of this endangered species. In the absence of such evidence, the respondents' determination to include all of the petitioners' ponds on the freshwater wetlands map was clearly without a rational basis.

The second theory relied on by the DEC, i.e., that the petitioners' ponds were hydraulically connected to an aquifer, is not only baseless, but appears to have been abandoned by the respondents as a viable justification for the freshwater wetlands designation since this argument was not pursued before Special Term nor on appeal. In any event, according to DEC regulations, in order for a wetlands to be hydraulically connected to an aquifer "the pervious earth materials underlying the wetland must be more than three meters (approximately 10 feet) thick" *(see,* 6 NYCRR 664.6 [d] [4]). The regulation further provides that clay is not a pervious material. The record discloses that the ponds in dispute are lined with impervious clay and are separated from the aquifer by layers of impervious materials of an indeterminate thickness. Special Term was, therefore, correct in concluding that the inclusion of the property on the final wetlands map could not be predicated upon an alleged hydraulic connection between the ponds and the aquifer since there was clearly no such connection according to the DEC's own regulations as well as its evidence.

We turn now to the principal argument on which the petitioners rely for reversal. They maintain that the theory that the ponds served an important recharge function by capturing water runoff from upland areas which then overflowed their basins and ultimately percolated down to underlying aquifers, should not have been considered or relied upon by Special Term.

" 'A fundamental principle of administrative law * * * limits judicial review of an administrative determination solely to the grounds invoked by the agency, and if those grounds are insufficient or improper, the court is powerless to sanction the determination by substituting what it deems a more appropriate or proper basis' " *(see, Matter of Consolidated Edison Co. v Public Serv. Commn., 63 NY2d 424, 441, appeal dismissed — US —, 105 S Ct 1831, quoting from Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 57 NY2d 588, 593).*

The respondents' contention that the ponds enhance groundwater resources by recharging runoff water into the aquifer, is a postdesignation theory which was initially tendered in opposition to the petition for article 78 relief. "Thus, the purported 'proof' dehors the [administrative] record should not have been considered by Special Term and must be disregarded by us on appeal *(Matter of Fanelli v New York City Conciliation & Appeals Bd.,* 58 NY2d 952, affg 90 AD2d 756, 757)" *(see, Matter of Celestial Food Corp. v New York State Liq. Auth.,* 99 AD2d 25, 27). Judicial review of the decision to include portions of the petitioners' property on the final freshwater wetlands map properly should have been limited to those facts and theories existing at the time of the decision *(see, Matter of Ryder Truck Rental v Parking Violations Bur.,* 62 NY2d 667; *Matter of Circus Disco v New York State Liq. Auth.,* 51 NY2d 24; *Matter of Hyacinthe v Glaser,* 104 AD2d 651; *Matter of Raymus [Roberts],* 102 AD2d 154).

Special Term, in rejecting the grounds upon which the DEC based its determination, considered and ultimately relied upon a theory that had not been previously advanced. We find that Special Term exceeded the appropriate boundaries of judicial review and thereby committed a fundamental error in relying upon this postdesignation theory and that, based upon the facts presented, there was, in any event, no merit to the basis upon which Special Term predicated its determination. Accordingly, the judgment appealed from should be reversed and the respondents should be directed to amend the final freshwater wetlands map promulgated on July 30, 1984, by removing petitioners' property therefrom.

MOLLEN, P. J., THOMPSON and NIEHOFF, JJ., concur.

Judgment of the Supreme Court, Nassau County, entered August 26, 1986, reversed, on the law, without costs or disbursements, petition granted, the respondents' determination

dated July 30, 1984, annulled, and the respondents are directed to amend their final freshwater wetlands map to remove the petitioners' property therefrom.