Kaye, J.
(dissenting). Long Island’s aquifer provides the sole source of drinking water for Nassau and Suffolk Counties. Concerned about its threatened contamination by municipal solid waste, in 1983 the Legislature adopted the Long Island Landfill Closure Act (ECL 27-0704), curtailing landfills in the deep flow recharge area (through which precipitation replenishes the aquifer). The body of the statute — as its title — leaves no doubt of the underlying legislative purpose: existing Long Island landfills in the deep flow recharge area are to be capped and closed, and no new landfill or expansion of an existing landfill permitted. A "limited expansion” might be allowed by the Commissioner as a stopgap measure, but he is without authority to do even that without first listening to the public at a hearing and then finding there are no other feasible means of waste management available (ECL 27-0704 [3]). In this case he did neither.
This action concerns the Blydenburgh Landfill, which is located over the deep flow recharge area, and a consent order privately negotiated between the Town of Islip and the Department of Environmental Conservation (DEC) that permits substantial capacity to be added to the landfill. The issue that divides us is whether breathing new life into the Blydenburgh Landfill — permitting new capacity of up to 900,000 tons of solid waste, adding 50 more feet to the tower of refuse than the stipulated maximum, extending the landfill’s active life by three years — is an "expansion” or even a "limited expansion” of the landfill legislatively targeted for closure. The majority denies that this gross enlargement can even be considered a "limited expansion” because the landfill is expanding vertically; it therefore concludes that a private compact without public input is authorized. We disagree. The arrangement between the DEC and the Town of Islip is plainly an expansion of the Blydenburgh Landfill. It must be exposed to public scrutiny and then permitted by the Commissioner only if he finds there are no other feasible means of waste management available.
I.
The issue is best viewed in the context of a brief recapitulation of the facts.
In the past seven years the Blydenburgh Landfill has been *308 the subject of three consent orders between the Town of Islip and the DEC. A common thread throughout is that the major active portion of the landfill — the unlined area — was to be capped and closed. The first consent order, in 1980, required the Town to cease accepting any refuse at the landfill except to the extent needed to contour it in preparation for capping in accordance with a Town plan to be submitted for approval to the DEC. The consent order further required the Town to submit a plan to double-line a smaller, 16-acre section adjacent to the area to be closed and construct a leachate recovery system there, with the ultimate goal of using that new area for municipal solid waste disposal.
Islip and the DEC ultimately sued each other, engendering a second consent order in 1983. The 1983 consent order continued the original objective of closing the landfill and requiring the Town to implement alternative waste disposal methods, including resource recovery. By this time Islip had apparently complied with some of the requirements of the 1980 consent order: the unlined portion of the landfill had been capped and closed at a height of 250 feet with the slope fixed at "l-to-6”, and the adjacent 16-acre area had been lined and put into operation. In August 1985, Islip submitted a capping and closure plan then being implemented in the closed portion of the site, but the DEC found it inadequate.
As litigation continued, the Town was running out of landfill capacity. Apparently, the 16-acre area receiving new waste would be full by March 1987. Islip’s Solid Waste Management Plan called for a new landfill to be constructed in Edgewood, at which time the Town would close Blydenburgh. But construction of the Edgewood Landfill never materialized, and Islip was forced to shift its focus back to Blydenburgh. The Town itself rejected vertical expansion above the 250-foot height of the capped and closed portion of the existing landfill, and instead proposed opening a new section. The DEC, however, was concerned both because this would interfere with the cleanup of the existing site and because feasible alternatives were available. The DEC ultimately prevailed (Town of Islip v Williams, 126 AD2d 276, Iv denied 70 NY2d 602) and the proposal was abandoned.
In spring 1987, a deal was struck between the Town and the DEC. As recited by Supreme Court and affirmed by the Appellate Division (134 AD2d 246), the concluding chapter in the tale of the infamous garbage barge Mobro was written *309 when various agencies agreed that its 3,100 tons of raw garbage would be burned at an incinerator in Brooklyn and the residue transported to Blydenburgh. Islip agreed to take back this residue, and it received from the DEC the right to expand Blydenburgh materially. The May 12, 1987 consent order permitted the Town to modify its closure plan so that municipal solid waste could be added both to the closed area and to the adjacent 16-acre area — the combined base obviously offering greatly increased capacity. The maximum allowable height of the combined area was increased from 250 to 300 feet and the slope steepened from l-to-6 to l-to-3. Additionally, Islip was granted permission to use an area adjacent to an elementary school (area F) owned by petitioner Board of Education as a disposal site for incinerator ash. As part of the consent order, the Town agreed to remediate the landfill subject to DEC approval, pay for DEC employees to monitor waste coming onto the landfill, modify the gas collection system to prevent the migration of gas from the site, and undertake an extensive recycling program.
Petitioners (NYPIRG and the Board of Education of the Hauppauge Union Free School District) urge that the deal struck between the Town and the DEC — with no public hearing — while expedient for both sides, contravenes the Landfill Closure Law and the underlying legislative concern for contamination of Long Island’s sole source aquifer. Their contentions are meritorious.
II.
The Long Island Landfill Closure Law (ECL 27-0704 [3]) provides that "no person shall commence operation, including site preparation, of a new landfill or of an expansion to an existing landfill which is located in a deep flow recharge area. However, the commissioner, after conducting a public hearing, may approve a limited expansion of any existing landfill in a deep flow recharge area for the sole purpose of providing for solid waste disposal capacity prior to the implementation of a resource recovery system. The commissioner shall not approve any such expansion unless he finds * * * that no other feasible means of solid waste managements is available, taking into account technological, economic and other essential factors.”
The majority adopts the conclusion reached by Supreme Court and the Appellate Division that "expansion” as used in *310 ECL article 27 means only lateral expansion, not vertical expansion. It does so on three perceived grounds: first, the sense of the word in its immediate statutory context; second, DEC’S expert reading of the word; and third, the statute’s underlying purpose. None of these is persuasive.
If the statute is first tó be examined on its face — as we agree it must — then the majority erroneously bypasses the ordinary, commonsense meaning of the word "expansion.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 232.) Understandably so. In its ordinary use "expansion” plainly means increase or growth; neither the word nor the statute limits the direction. Nor is there merit in the argument that "expansion” could not possibly include vertical expansion because daily garbage deposits would otherwise trigger the need for a hearing. Daily garbage deposits within a landfill’s capacity obviously do not require a public hearing. Here, however, the parties agreed — by a very particular plan specifying height and grade — to expand the tower of refuse 50 feet beyond the landfill’s stipulated capacity, steepening its slope and adding 900,000 tons of waste, or three more years to its active life. That is not ordinary daily waste deposit, but quite a different matter. Nor is there support for the majority’s conclusion in reading the word "expansion” in its immediate statutory context. Even if to "commence operation” contemplated only a wholly new beginning — which we dispute — there is no question on this record that the major portion of the Blydenburgh Landfill in issue here (the unlined area) had been capped and closed, requiring a new beginning. Similarly, in the case before us there was substantial dispute as to whether area F-— designated in the consent order to receive the ash — had ever operated as a landfill; at best it had not been used as a landfill for three or four years. (This facet of the consent order alone warrants the exploration and public scrutiny of the statutorily prescribed hearing.) Thus, it is obvious that even a vertical expansion may also entail a new beginning or commencement of operations; it does in the very case before us.
Reading the word "expansion” alone or in its immediate statutory context leads to only one conclusion: from the title on through, it is plain that the legislation was meant to curtail and close critically situated Long Island landfills, not to sanction their skyward expansion.
An administrative agency is of course bound by the statutory language, and cannot constrict, expand or interpret it in *311 ways not intended by the Legislature (see, e.g., Matter of Trump-Equitable Fifth Ave. Corp. v Gliedman, 57 NY2d 588, 595; Matter of Jones v Berman, 37 NY2d 42; see also, Boreali v Axelrod, 71 NY2d 1). A statute circumscribes agency authority, not vice versa (see, e.g., Matter of McNulty v New York State Tax Comma., 70 NY2d 788, 791). The majority places undue reliance on the DEC’s reading of the statute, on its regulation, and on its apparent application of the regulation in one prior instance when it rejected Islip’s application for a lateral expansion. There is no evidence in this record of any consistent pattern of application by the DEC of its cramped definition of "expansion” — even assuming that an agency’s consistent interpretation can itself limit a statute (which it surely cannot).
The majority’s conclusion that DEC’s reading of the word "expansion” is reasonable in light of its technical expertise rests on an affidavit from one of DEC’s engineers, simply asserting that "a vertical expansion, as opposed to a lateral expansion, does not pose a significant threat to the ground water because 'recharge is among other things, a function of areal extent’, and that there is a 'reduced potential for leach-ate formation from a vertical versus a lateral expansion’.” (Majority opn, at 303.) Such a downplaying of the environmental impact of vertical expansion, however, was directly contradicted by Islip’s own 1985 environmental impact statement, also part of the record before us. In that document, prepared for a proposed lateral expansion, the Town itself pointed out that "a higher landfill is not an acceptable alternative,” and it raised concerns incident to vertical expansion including "erosion of the landfill cap and an increase in attendant nuisances (exposure of buried garbage, odor, unattractiveness and repair costs)”. Petitioners urge that in fact piling garbage on top of an already loaded site could substantially weaken the underlying barrier, thereby increasing the volume of leachate reaching the aquifer, and that the resulting increased volume acquires a higher concentration of contaminants as it is tunneled through a higher mountain of garbage. While courts may not be best suited to resolving such highly technical disputes, and there is much to be said for recognizing the Commissioner’s unquestioned expertness, still that is no basis for abdicating to the DEC and abandoning the clear mandate of the Legislature — to have such matters aired at public hearings where expert opinions can be confronted and challenged. This process neither eliminates nor undermines the *312 Commissioner’s ultimate power to decide the most feasible means for waste disposal. To the contrary, the public participation contemplated by the statute enlightens and informs that decision.
Little need be said of the majority’s conclusion that permitting this substantial expansion of a Long Island landfill to be accomplished by private agreement is actually consistent with the underlying purpose of a statute whose sole purpose is to direct their closure, forbid their expansion, and permit even limited expansion only after a public hearing and finding of no feasible alternative.
In view of the life-and-death importance of drinking water to Long Island residents, it is no surprise that the Legislature has provided them with an opportunity to be heard before a critically situated landfill may be expanded, and no surprise that well over 1,000 people in fact attended a hearing conducted by the Commissioner in connection with the Town’s earlier effort to expand Blydenburgh. However desperate the Town’s long-standing waste disposal problem may appear at this moment (compare, Flushing Natl. Bank v Municipal Assistance Corp., 40 NY2d 731), it is indeed unfortunate that a way has been found to defeat the prescribed statutory procedure, and that it now receives this court’s sanction.
We would reverse the Appellate Division order and grant the petition.
Chief Judge Wachtler and Judges Simons and Alexander concur with Judge Hancock, Jr.; Judge Kaye dissents and votes to reverse in a separate opinion in which Judge Bellacosa concurs; Judge Titone taking no part.
Order affirmed, with costs.