■ In the Matter of ONTARIO COUNTY, Appellant, v CAPITAL DISTRICT REGIONAL OFF-TRACK BETTING CORPORATION et al., Respondents.—Levine, J. Appeal from a judgment of the Supreme Court (Doran, J.), entered October 4, 1989 in Schenectady County, which dismissed petitioner's application, in a proceeding pursuant to CPLR article 78, to review a determination of respondent New York State Racing and Wagering Board regarding the amount of petitioner's surcharge revenue distribution.

Finger Lakes Racetrack (hereinafter Finger Lakes) is a licensed thoroughbred racetrack located in Ontario County which operates under the jurisdiction of respondent New York State Racing and Wagering Board (hereinafter the Board). Respondent Capital District Regional Off-Track Betting Corporation (hereinafter CDOTB) operates a total of 52 off-track betting parlors in its geographic territory. Of these locations, 42 "simulcast" Finger Lakes races while the remaining 10 branches conduct off-track betting on Finger Lakes races without simulcasting them.

A statutory 5% surcharge is collected from all winning bets placed at CDOTB locations (Racing, Pari-Mutuel Wagering and Breeding Law § 532 [1]). Half of these surcharge revenues are distributed to municipalities participating in off-track betting within CDOTB's territory (Racing, Pari-Mutuel Wagering and Breeding Law §§ 516, 532 [3] [a]). At issue in this case is the proper distribution of the remaining 50% under Racing, Pari-Mutuel Wagering and Breeding Law § 532 (3) (b). Under clause (ii) of this section, petitioner, Ontario County, would be

entitled to the remaining 50% of the revenues. However, clause (v), which was added in 1985 (L 1985, ch 286, § 29), provides that: "where the track conducting the race is located in a thoroughbred special betting district and is simulcasting pursuant to section one thousand eight of this chapter outside such special betting district, ninety per centum to the off-track betting operator and ten per centum to the county in which such track is located" (Racing, Pari-Mutuel Wagering and Breeding Law § 532 [3] [b] [v]).

Since clause (v) went into effect in July 1985, CDOTB has retained 90% of all of the second 50% of surcharge revenues generated from races at Finger Lakes and distributed the other 10% to petitioner. In January 1989, petitioner filed a petition with the Board objecting to CDOTB's method of calculating the distribution of the surcharge revenues. Petitioner argued that the 90%-10% distribution provided for in Racing, Pari-Mutuel Wagering and Breeding Law § 532 (3) (b) (v) should apply only to revenues generated from the particular CDOTB branches which simulcast and that, as to the nonsimulcasting locations, it should receive the full second 50% of the revenues under Racing, Pari-Mutuel Wagering and Breeding Law § 532 (3) (b) (ii). The Board denied the petition, adopting the position that 90%-10% distribution applied to all surcharge revenues generated by CDOTB and not simply to moneys from those branches engaged in simulcasting.

Petitioner commenced this CPLR article 78 proceeding seeking to annul the Board's determination. Supreme Court dismissed the petition, holding that the Board's interpretation of Racing, Pari-Mutuel Wagering and Breeding Law § 532 (3) (b) (v) to mandate a 90%-10% revenue distribution once an operator begins simulcasting is rational and entitled to judicial deference. Petitioner appeals.

In our view, Supreme Court correctly determined that the Board's interpretation of the statute is entitled to judicial deference. The Court of Appeals has held that the Board is vested with "broad discretion and power" to oversee and regulate all horse racing and pari-mutuel betting activity in the State (Matter of Capital Dist. Regional Off-Track Betting Corp. v New York State Racing & Wagering Bd., 54 NY2d 154, 158). Moreover, we agree with Supreme Court that the relationship between municipalities, off-track betting operators and racing associations is highly complex and the interpretation of Racing, Pari-Mutuel Wagering and Breeding Law § 532 (3) (b) (v) draws upon knowledge and understanding of the underlying operational practices and the problems of simul-

casting. For the foregoing reasons, the interpretation adopted by the Board must be upheld if not irrational or unreasonable *(see, Matter of Trump-Equitable Fifth Ave. Co. v Gliedman,* 62 NY2d 539, 549; *Matter of Judd v Constantine,* 153 AD2d 270, 272-273).

We are not persuaded that the construction adopted by the Board in this case is unreasonable or affected by an error of law. Under Racing, Pari-Mutuel Wagering and Breeding Law § 532 (3) (b) (v), because Finger Lakes is located in a thoroughbred special betting district *(see,* Racing, Pari-Mutuel Wagering and Breeding Law § 523 [5]) and is simulcasting outside such district, 90% of the revenues are payable to the "off-track betting *operator"* (emphasis supplied). An operator is defined as "any association or corporation operating a simulcast facility" (Racing, Pari-Mutuel Wagering and Breeding Law § 1001 [f]). Since CDOTB is an operator under the statute even though it does not simulcast through all of its locations, the Board's interpretation comports with the plain meaning of the statute and should be upheld *(see, Finger Lakes Racing Assn. v New York State Racing & Wagering Bd.,* 45 NY2d 471, 479-480).

Judgment affirmed, without costs. Mahoney, P. J., Kane, Yesawich, Jr., Levine and Mercure, JJ., concur. *[See,* 144 Misc 2d 893.]