71 N.Y.2d 292 (1988)
In the Matter of New York Public Interest Research Group, Inc., by Thomas A. Wathen, Its Executive Director, et al., Appellants,
v.
Town of Islip et al., Respondents, and Board of Education of Hauppauge Union Free School District, Intervenor-Appellant.
Court of Appeals of the State of New York.
Argued January 12, 1988
Decided February 11, 1988.
Eugene L. Wishod, Randall M. Weiner, Bruce H. Kaplan, Scott M. Karson and Lewis B. Oliver, Jr., for appellants and intervenor-appellant.
Guy W. Germano, Town Attorney (Michael J. Cahill, Bernard S. Meyer and Doris E. Roth of counsel), for Town of Islip and others, respondents.
Robert Abrams, Attorney-General (Ezra I. Bialik and O. Peter Sherwood of counsel), for Henry G. Williams, respondent.
Regina Seltzer for The Assembly Commission on Water Resource Needs for Long Island, amicus curiae.
Chief Judge WACHTLER and Judges SIMONS and ALEXANDER concur with Judge HANCOCK, JR.; Judge KAYE dissents and votes to reverse in a separate opinion in which Judge BELLACOSA concurs; Judge TITONE taking no part.
*296 HANCOCK, JR., J.
This is an appeal from a dismissal of a CPLR article 78 proceeding challenging an order on consent of the Department of Environmental Conservation (DEC) dated May 12, 1987 pertaining to the 87-acre landfill located on Blydenburgh Road, Town of Islip, Long Island. The order on consent was entered in a proceeding brought by the DEC against respondents Town of Islip and Islip Resource Recovery Agency.[1] The consent order contains several terms but the principal one about which the appeal centers modifies an earlier order on consent entered on August 5, 1980 in a DEC enforcement proceeding under which the Town of Islip was permitted to continue to use the landfill prior to final capping and closure in accordance with a plan to be submitted and approved by the DEC. The August 5 order provided that additions to the landfill prior to rounding off for capping should be made at a slope of 1 foot vertically to 6 horizontally. The disputed term in the May 12, 1987 order modifies this provision by increasing *297 the slope of the landfill to 1 foot to 3 feet; it also provides that the final permitted level of the landfill be raised to a height not in excess of 300 feet above sea level. Additionally, the May 12, 1987 order provides for the burial of ash from the Town's resource recovery system in the northwest portion of the landfill (area F).
In their appeal, by permission of this court, from the order of the Appellate Division unanimously affirming dismissal of the article 78 proceeding brought to annul the DEC May 12, 1987 consent order, petitioners and the intervenor-petitioner Board of Education advance two chief contentions: (1) that the order on consent violates the Long Island Landfill Closure Law because the increase in the permissible slope and in the maximum height and the permitted use of area F constitute "expansion[s] to an existing landfill which is located in a deep flow recharge area" (ECL 27-0704 [3]) which were approved by the DEC without meeting the statutory requirements that the Commissioner first conduct a public hearing and make a finding that "no other feasible means of solid waste management is available" (id.); and (2) that the order on consent is invalid for noncompliance with the State Environmental Quality Review Act (SEQRA) inasmuch as it was not an order entered in an enforcement proceeding and, thus, was not excluded from compliance by the provision in ECL 8-0105 (5) (i) exempting from SEQRA "enforcement proceedings or the exercise of prosecutorial discretion".[2] For reasons expressed hereafter, we hold that Supreme Court and the Appellate Division properly rejected these contentions and that the order should be affirmed.

I
The Blydenburgh Landfill has been in operation since 1927. Its operation predated enactment of various legislative measures designed to protect the environment and to prevent contamination from solid waste disposal sites  as, for example, *298 the Solid Waste Management and Resource Recovery Facilities Act (ECL art 27, tit 7, eff Sept. 1, 1973), SEQRA (ECL art 8, eff Sept. 1, 1976), the Long Island Landfill Closure Law (ECL art 27-0704, eff Dec. 18, 1983), and the Inactive Hazardous Waste Disposal Site Law (ECL art 27, tit 13, eff Aug. 26, 1979). For this reason, during most of its existence the entire Blydenburgh Landfill was operated without liners or other protection against contamination from seepage.
In the 1970s DEC became concerned that the landfill might be contaminating the ground water. It began discussions that have developed into a continuing series of disagreements between the DEC and the Town over the landfill's operation. The DEC commenced proceedings to compel the Town to close the landfill and to make plans for alternate means of refuse disposal. These proceedings culminated in the August 5, 1980 order on consent which required the Town to cease accepting additional refuse at the existing unlined landfill except for vertical additions to the extent needed for rounding off and capping the landfill provided, however, that these additions be made at a slope of 1 foot on 6 feet. The August 5, 1980 order on consent imposed other requirements on the Town, including, most significantly, the direction that it submit a plan for double-lining and constructing a leachate recovery system for a new 16-acre section of the landfill (area A). The Town was also directed to develop a methane gas venting plan and to attempt various alternate disposal options including source separation and incineration. It was contemplated that the new lined 16-acre section at Blydenburgh together with a large undeveloped site in Edgewood  which the Town of Islip had acquired for a future landfill  would meet the Town's needs.
Disputes between the Town and the DEC over the acceptability of respondents' plans for the new lined 16-acre section at Blydenburgh and its compliance with other provisions of the August 5, 1980 order persisted and eventually led to litigation. Cross actions were brought between the parties in Supreme Court, Suffolk County, which resulted in a consent judgment entered on January 13, 1983. The consent judgment changed the August 5, 1980 order and imposed additional obligations on the Town. The requirement of the August 5, 1980 order on consent pertaining to closure of the unlined portion of the landfill including the 1 on 6 slope remained in effect, however, as did the direction that the Town proceed with the lined 16-acre area (area A).
*299 Despite the settlement of the litigation in the 1983 consent judgment, the DEC and the Town of Islip continued to disagree over the Town's compliance with the judgment and with the remaining provisions of the August 5, 1980 consent order. It was during this period that the Long Island Landfill Closure Law (ECL 27-0704) became law having been enacted on June 29, 1983 to become effective on December 18, 1983. This statute outlawed any new landfill in a deep flow recharge area (ECL 27-0704 [3]). Also, no existing landfill in a deep flow recharge area, such as the Town's landfill at Blydenburgh, could, with very limited exceptions, continue in operation after December 18, 1990 (ECL 27-0704 [5]). Because the site which the Town had acquired at Edgewood was also in a deep flow recharge area, the Town, as a consequence of the new statute, could no longer count on the future use of a landfill at that location. In a new legal proceeding the Town sought to challenge the Long Island Landfill Closure Law on the ground that it was beyond the Legislature's power to enact special legislation pertaining to the property, affairs or government of a local government (see, NY Const, art IX, § 2 [b] [2]). Our court ultimately rejected the Town's contentions, holding the legislation valid as relating to a matter of general State concern (see, Matter of Town of Islip v Cuomo, 64 N.Y.2d 50, 52, 58).
Thereafter, in September 1985, the Town petitioned the DEC pursuant to the provisions of the Long Island Landfill Closure Law for permission to make a limited lateral expansion of the Blydenburgh Landfill into an area immediately south of the existing site. The DEC, after conducting an "expansion" hearing as required by ECL 27-0704 (3), denied the request. It concluded that the Town could dispose of its waste by providing off-island trucking and that the Town had, therefore, not made the required statutory showing that "no other feasible means of solid waste management [was] available" (ECL 27-0704 [3]). The Town resorted once more to the courts to challenge the DEC's denial of its request for lateral expansion. Its CPLR article 78 proceeding was dismissed and the determination of the DEC unanimously confirmed by the Appellate Division (Town of Islip v Williams, 126 AD2d 276, lv denied 70 N.Y.2d 602). In confirming, the Appellate Division held that although the acceptability of the cost of off-island trucking might be debatable, "the Commissioner's determination that such cost is not so exorbitant as to render a program of off-island trucking `infeasible' is not so one-sided as to be *300 irrational" and that "the Commissioner's interpretation of the statute, not being irrational, should be upheld (Matter of Bernstein v Toia, 43 N.Y.2d 437, 448; Matter of Howard v Wyman, 28 N.Y.2d 434, 438; Town of Hempstead v Flacke, supra)" (id., at 280).
Faced with the impossibility of obtaining more landfill capacity through lateral expansion at Blydenburgh and with the necessity of abandoning its plans for a new landfill at Edgewood because of the passage of the Long Island Landfill Closure Law, the Town consented to the DEC order of May 12, 1987  the subject of this litigation. Besides the above-described amendments of the March 5, 1980 order pertaining to the slope and maximum height and the direction that area F be used for ash burial, the May 12, 1987 order on consent contains several significant provisions. By its terms, the Blydenburgh Landfill is treated as a waste disposal site subject to the provisions of ECL article 27, title 13 pertaining to inactive hazardous waste disposal sites. The consent order provides that the Town will enter into a further order on consent requiring it to undertake a "Remedial Investigation and a Feasibility Study of Remedial Options (`RI/FS') as well as remediation of the Landfill" as an inactive hazardous waste disposal site; that it develop and implement a work plan for the remediation of the inactive hazardous waste disposal site subject to DEC approval and in compliance with the requirements established by the United States Environmental Protection Agency; that it must provide the DEC with all information and data in its possession regarding the use of the Blydenburgh Landfill for disposal of hazardous wastes; that the Town pay to the DEC a sum not to exceed $125,000 per year for the employment of full-time monitors at the landfill who will assure that the landfill is used only for nonhazardous wastes from the Town of Islip and that such waste is deposited in accordance with applicable rules and regulations and the terms of the consent order; that it will install a leachate barrier and collection system in two portions of the landfill (area C and area F); that the Town will modify the existing gas collection system at the landfill to prevent off-site migrations of toxic wastes and explosive gases; and that it must enter into an action program immediately for the recycling of the Town's municipal waste to the maximum extent practicable and consistent with the New York State Waste Management Plan. Under the order on consent, the DEC retains jurisdiction over the landfill and over the Town's compliance *301 with the terms of the order and the applicable statutes, rules and regulations. In consenting to the order, the Town waives any right to a hearing including the right to contest the determination that the Blydenburgh Landfill is an inactive hazardous waste site posing a significant threat to the environment and that it must, therefore, develop and implement a remedial program (see, ECL 27-1313 [3], [4]).[3]
On May 15, 1987, petitioner NYPIRG commenced the instant CPLR article 78 proceeding seeking to annul the May 12, 1987 consent order and to enjoin the parties from acting on that order. The Hauppauge Union Free School District Board of Education was thereafter permitted to intervene as a petitioner. The court dismissed the petition holding, among other things, that ECL 27-0704 (3) does not encompass vertical expansions; that respondents were not required to follow SEQRA since the May 12 order was an act of prosecutorial discretion in an enforcement proceeding and, therefore, not an action for purposes of SEQRA (see, ECL 8-0105 [5] [i]); and that the Ashfill Law was not violated because it applies only to the selection of a regional ashfill site. The Appellate Division unanimously affirmed for the reasons stated at Supreme Court.

II
We address first petitioner's contention that the order on consent of May 12, 1987 is invalid because it violates the Long Island Landfill Closure Law (ECL 27-0704). ECL 27-0704 (3) provides that, as of December 18, 1983: (1) all new landfills are prohibited in deep flow recharge areas and (2) expansions to existing landfills in such areas are prohibited except where, among other things, the Commissioner finds, after a public hearing, that no other feasible means of waste management is available.[4] Petitioners maintain that compliance with the *302 statute was required because the order on consent constitutes the Commissioner's approval of "a limited expansion of [an] existing landfill which is located in a deep flow recharge area" (ECL 27-0704 [3]). Their argument depends upon the interpretation of the word "expansion" as including the vertical expansion of the landfill which would necessarily result when municipal solid waste from the Town is added to the existing landfill under the provisions permitting a steeper slope for the landfill and increasing its maximum height to 300 feet. The Town argues that compliance with the statute was not required because it applies only to expansions which are lateral or horizontal.
We agree with Supreme Court and the Appellate Division that "expansion" was intended to include lateral but not vertical expansions. We reach this construction from the sense of the word "expansion" as it is used in its immediate statutory context and as part of the entire Long Island Landfill Closure Law (see, McKinney's Cons Laws of NY, Book 1, Statutes § 97). This construction, we observe, accords with the meaning of the term "expansion" that has been continuously accepted by the DEC in its administration of the statute (see, McKinney's Statutes § 129). Moreover, it is consistent with the underlying purpose and statutory scheme of the Long Island Landfill Closure Law as seen from its provisions and the applicable legislative history (see, McKinney's Statutes § 96; Matter of Frew Run Gravel Prods. v Town of Carroll, 71 N.Y.2d 126, 131-134).
The Long Island Landfill Closure Law (ECL 27-0704) contains no definition of the term "expansion". From the word's context in subdivision (3), however, it seems evident that it could not have been meant to include the vertical expansion which necessarily results from piling refuse on what has already accumulated in a landfill. New landfills and expansions of existing landfills are treated together in the first sentence of the section: "no person shall commence operation, *303 including site preparation, of a new landfill or of an expansion to an existing landfill" (ECL 27-0704 [3] [emphasis added]). Significantly, the prohibition of new landfills and expansions of existing landfills  which the quoted language imposes  is with respect to the commencement of their operation and the preparation of their sites  acts which could naturally and logically pertain to new landfills and newly expanded areas adjacent to existing landfills but not to vertical expansions, which would not entail the commencement of operations or require site preparation.
This meaning of the word "expansion" as applying only to expansions which are lateral comports with the interpretation of the term adopted by the Commissioner from the time of the statute's inception in 1983. In the guidelines for the implementation of the Long Island Landfill Closure Law adopted by the Commissioner in February 1984, "expansion" is defined as "a lateral extension of a landfill beyond the boundaries of an existing landfill" (Long Island Landfill Law Implementation Guidelines § 3.8).[5] This is the intended meaning of the term as it has been used consistently by the Department in its application of ECL 27-0704 (3) including its determination of Islip's request for a lateral expansion which the DEC ultimately rejected (see, Determination of Commissioner of DEC Project No. 10-86-0673).
The Commissioner's construction is based, in part, on the DEC's technical expertise and its judgment that a vertical expansion, as opposed to a lateral expansion, does not pose a significant threat to the ground water because "recharge is among other things, a function of areal extent", and there is a "reduced potential for leachate formation from a vertical versus a lateral expansion". Inasmuch as this appears to be a reasonable reading of the statute based on the technical expertise of the agency charged with the responsibility of administering the Long Island Landfill Closure Law, we agree with Supreme Court that there is no reason for rejecting it (Matter of Bernstein v Toia, supra, at 448; cf., Kurcsics v Merchants Mut. Ins. Co., 49 N.Y.2d 451, 459; see also, Town of Islip v Williams, 126 AD2d 276, 280, lv denied 70 N.Y.2d 602, supra [where the court, in confirming the DEC's rejection of *304 respondents' lateral expansion, accepted the Commissioner's interpretation of the word "feasible" as part of his conclusion that off-island trucking was a feasible alternate means of refuse disposal]).
Further, the Commissioner's construction of ECL 27-0704 (3)  as applying only to lateral expansions of existing landfills  is consistent with the statute's underlying purpose of protecting Long Island's sole source aquifer and its scheme of phasing out landfills and accelerating the transition to resource recovery (see, Matter of Town of Islip v Cuomo, 64 N.Y.2d 50, supra; Mem of State Executive Dept in support of L 1983, ch 299, reprinted in 1983 McKinney's Session Laws of NY, at 2502-2503). While the statute prohibits all new landfills in deep flow recharge areas and greatly restricts expansions of existing landfills, it recognizes that the transition to resource recovery will require time for completion and the accommodation of the needs for municipal solid waste disposal in the heavily populated area during the transition period. Thus, the scheme contemplates the continued use of existing landfills for municipal solid waste as approved and controlled by the Commissioner during a seven-year period by the end of which the phase-out is to be accomplished. The Commissioner's application of the statute is consistent with the aim of safeguarding the aquifer because, as noted, it reflects the Department's expert judgment that there is a reduced potential for leachate formation from a vertical as opposed to a lateral expansion.
Finally, we reject petitioners' contention that the provisions of the May 12, 1987 consent order pertaining to area F constitute not a vertical expansion but a lateral expansion into a new area which would be prohibited unless specifically authorized by the Commissioner pursuant to ECL 27-0704 (3). The simple answer is that the record contains unrefuted affidavits of officials of the DEC, based on excavations, that area F is not a new site but a solid waste landfill site used before the effective date of the Long Island Landfill Closure Law. The courts below, in rejecting petitioners' contention, have apparently accepted the Commissioner's position that the addition of material on area F constituted a vertical expansion and not a lateral expansion requiring an application under the statute. No reason has been shown why we should do otherwise.

*305 III
Notwithstanding our holding that the May 12, 1987 order on consent is not an expansion requiring an application in compliance with ECL 27-0704 (3), petitioners maintain that the order is invalid because the Town did not comply with SEQRA. The contention depends on the consent order being an action within the meaning of ECL 8-0105 (4), thereby triggering the requirements for SEQRA compliance. The contention of the DEC, accepted by the courts below, however, is that the order on consent is expressly exempted from the definition of "action" by ECL 8-0105 (5) which, in pertinent part, states:
"`Actions' do not include:
"(i) enforcement proceedings or the exercise of prosecutorial discretion in determining whether or not to institute such proceedings".
Petitioners argue that the order on consent is not truly an enforcement proceeding because it "fails to impose any substantially new obligations on the Town" and that, because the permitted vertical expansion will assertedly accommodate an estimated 900,000 tons of solid waste and extend the life of the Blydenburgh Landfill for approximately three years, the order should be regarded as an expansion agreement requiring SEQRA compliance. On the other hand, in support of its position, the DEC has filed an affidavit of the Executive Deputy Commissioner detailing the lengthy history of the Department's enforcement efforts with respect to the Blydenburgh Landfill. The affidavit points out, among others things, that the May 12, 1987 order on consent was a modification of the August 5, 1980 order, which, itself, was an order made in an enforcement proceeding and, as such, exempt from SEQRA under ECL 8-0105 (5).
The DEC is the agency charged with the administration of SEQRA. The Commissioner has been given authority to "adopt rules and regulations implementing the provisions" of SEQRA (ECL 8-0113 [1]) including, specifically, regulations pertaining to the definitions of the terms used in SEQRA (ECL 8-0113 [2] [a]). Pursuant to this authority, the Commissioner has adopted a more detailed definition of "exempt action" which includes the following: "civil or criminal enforcement proceedings, whether administrative or judicial, including a particular course of action specifically required to be undertaken pursuant *306 to a judgment or order, or the exercise of prosecutorial discretion" (6 NYCRR 617.2 [q] [1]).
We conclude that the Commissioner's application of the statute (ECL 8-0105 [5]) and of his regulation (6 NYCRR 617.2 [q] [1]) in exempting the May 12, 1987 order on consent  as an order entered in an enforcement proceeding in the exercise of the Department's prosecutorial discretion  was reasonable and that it should, therefore, be upheld (see, Matter of Bernstein v Toia, 43 N.Y.2d 437, 448, supra; Matter of Howard v Wyman, 28 N.Y.2d 434, 438, supra). We observe that, contrary to petitioners' contentions, the May 12, 1987 order on consent does impose substantial obligations on the Town including, most significantly, the binding determination that the Blydenburgh Landfill is an inactive hazardous waste disposal site constituting a significant threat to the environment and the provision of the order that the Town comply with the stringent remedial requirements and enforcement provisions of ECL 27-1313.
Moreover, as we noted in Flacke v Onondaga Landfill Sys. (69 N.Y.2d 355, 362, 363), the "regulation of solid waste management facilities is a legislative function delegated to the DEC by statute (ECL 27-0103)" and "ECL 71-2727 (1) specifically provides that the Commissioner may take `such remedial measures as may be necessary or appropriate' and expressly authorizes initiation of any appropriate action or proceeding to enforce the provisions of article 27, any rule or regulation promulgated pursuant thereto and any order issued or penalty assessed thereunder (ECL 71-2727 [2])". The Commissioner, it appears, has exercised his statutory authority to control the operation of landfills on Long Island other than the one at Blydenburgh. Indeed, at the time of enactment of the Long Island Landfill Closure Law, 11 of the 15 landfills in Suffolk and Nassau Counties were, like the Blydenburgh Landfill, being operated under orders on consent. It thus seems evident that the May 12, 1987 consent order  and the vertical expansion permitted thereby  were matters well within the prosecutorial discretion given the Commissioner to issue and modify orders in enforcement proceedings in connection with violations of ECL article 27 (see, Flacke v Onondaga Landfill Sys., supra, at 362, 363). We conclude, then, that Supreme Court and the Appellate Division properly accepted the DEC's determination that the May 12, 1987 order was exempt as a matter involving prosecutorial discretion in an enforcement proceeding (see, ECL 8-0105 [5]; 6 NYCRR 617.2 [q] [1]).
*307 The order should, therefore, be affirmed, with costs.
KAYE, J. (dissenting).
Long Island's aquifer provides the sole source of drinking water for Nassau and Suffolk Counties. Concerned about its threatened contamination by municipal solid waste, in 1983 the Legislature adopted the Long Island Landfill Closure Act (ECL 27-0704), curtailing landfills in the deep flow recharge area (through which precipitation replenishes the aquifer). The body of the statute  as its title  leaves no doubt of the underlying legislative purpose: existing Long Island landfills in the deep flow recharge area are to be capped and closed, and no new landfill or expansion of an existing landfill permitted. A "limited expansion" might be allowed by the Commissioner as a stopgap measure, but he is without authority to do even that without first listening to the public at a hearing and then finding there are no other feasible means of waste management available (ECL 27-0704 [3]). In this case he did neither.
This action concerns the Blydenburgh Landfill, which is located over the deep flow recharge area, and a consent order privately negotiated between the Town of Islip and the Department of Environmental Conservation (DEC) that permits substantial capacity to be added to the landfill. The issue that divides us is whether breathing new life into the Blydenburgh Landfill  permitting new capacity of up to 900,000 tons of solid waste, adding 50 more feet to the tower of refuse than the stipulated maximum, extending the landfill's active life by three years  is an "expansion" or even a "limited expansion" of the landfill legislatively targeted for closure. The majority denies that this gross enlargement can even be considered a "limited expansion" because the landfill is expanding vertically; it therefore concludes that a private compact without public input is authorized. We disagree. The arrangement between the DEC and the Town of Islip is plainly an expansion of the Blydenburgh Landfill. It must be exposed to public scrutiny and then permitted by the Commissioner only if he finds there are no other feasible means of waste management available.

I.
The issue is best viewed in the context of a brief recapitulation of the facts.
In the past seven years the Blydenburgh Landfill has been *308 the subject of three consent orders between the Town of Islip and the DEC. A common thread throughout is that the major active portion of the landfill  the unlined area  was to be capped and closed. The first consent order, in 1980, required the Town to cease accepting any refuse at the landfill except to the extent needed to contour it in preparation for capping in accordance with a Town plan to be submitted for approval to the DEC. The consent order further required the Town to submit a plan to double-line a smaller, 16-acre section adjacent to the area to be closed and construct a leachate recovery system there, with the ultimate goal of using that new area for municipal solid waste disposal.
Islip and the DEC ultimately sued each other, engendering a second consent order in 1983. The 1983 consent order continued the original objective of closing the landfill and requiring the Town to implement alternative waste disposal methods, including resource recovery. By this time Islip had apparently complied with some of the requirements of the 1980 consent order: the unlined portion of the landfill had been capped and closed at a height of 250 feet with the slope fixed at "1-to-6", and the adjacent 16-acre area had been lined and put into operation. In August 1985, Islip submitted a capping and closure plan then being implemented in the closed portion of the site, but the DEC found it inadequate.
As litigation continued, the Town was running out of landfill capacity. Apparently, the 16-acre area receiving new waste would be full by March 1987. Islip's Solid Waste Management Plan called for a new landfill to be constructed in Edgewood, at which time the Town would close Blydenburgh. But construction of the Edgewood Landfill never materialized, and Islip was forced to shift its focus back to Blydenburgh. The Town itself rejected vertical expansion above the 250-foot height of the capped and closed portion of the existing landfill, and instead proposed opening a new section. The DEC, however, was concerned both because this would interfere with the cleanup of the existing site and because feasible alternatives were available. The DEC ultimately prevailed (Town of Islip v Williams, 126 AD2d 276, lv denied 70 N.Y.2d 602) and the proposal was abandoned.
In spring 1987, a deal was struck between the Town and the DEC. As recited by Supreme Court and affirmed by the Appellate Division (134 AD2d 246), the concluding chapter in the tale of the infamous garbage barge Mobro was written *309 when various agencies agreed that its 3,100 tons of raw garbage would be burned at an incinerator in Brooklyn and the residue transported to Blydenburgh. Islip agreed to take back this residue, and it received from the DEC the right to expand Blydenburgh materially. The May 12, 1987 consent order permitted the Town to modify its closure plan so that municipal solid waste could be added both to the closed area and to the adjacent 16-acre area  the combined base obviously offering greatly increased capacity. The maximum allowable height of the combined area was increased from 250 to 300 feet and the slope steepened from 1-to-6 to 1-to-3. Additionally, Islip was granted permission to use an area adjacent to an elementary school (area F) owned by petitioner Board of Education as a disposal site for incinerator ash. As part of the consent order, the Town agreed to remediate the landfill subject to DEC approval, pay for DEC employees to monitor waste coming onto the landfill, modify the gas collection system to prevent the migration of gas from the site, and undertake an extensive recycling program.
Petitioners (NYPIRG and the Board of Education of the Hauppauge Union Free School District) urge that the deal struck between the Town and the DEC  with no public hearing  while expedient for both sides, contravenes the Landfill Closure Law and the underlying legislative concern for contamination of Long Island's sole source aquifer. Their contentions are meritorious.

II.
The Long Island Landfill Closure Law (ECL 27-0704 [3]) provides that "no person shall commence operation, including site preparation, of a new landfill or of an expansion to an existing landfill which is located in a deep flow recharge area. However, the commissioner, after conducting a public hearing, may approve a limited expansion of any existing landfill in a deep flow recharge area for the sole purpose of providing for solid waste disposal capacity prior to the implementation of a resource recovery system. The commissioner shall not approve any such expansion unless he finds * * * that no other feasible means of solid waste managements is available, taking into account technological, economic and other essential factors."
The majority adopts the conclusion reached by Supreme Court and the Appellate Division that "expansion" as used in *310 ECL article 27 means only lateral expansion, not vertical expansion. It does so on three perceived grounds: first, the sense of the word in its immediate statutory context; second, DEC's expert reading of the word; and third, the statute's underlying purpose. None of these is persuasive.
If the statute is first to be examined on its face  as we agree it must  then the majority erroneously bypasses the ordinary, commonsense meaning of the word "expansion." (McKinney's Cons Laws of NY, Book 1, Statutes § 232.) Understandably so. In its ordinary use "expansion" plainly means increase or growth; neither the word nor the statute limits the direction. Nor is there merit in the argument that "expansion" could not possibly include vertical expansion because daily garbage deposits would otherwise trigger the need for a hearing. Daily garbage deposits within a landfill's capacity obviously do not require a public hearing. Here, however, the parties agreed  by a very particular plan specifying height and grade  to expand the tower of refuse 50 feet beyond the landfill's stipulated capacity, steepening its slope and adding 900,000 tons of waste, or three more years to its active life. That is not ordinary daily waste deposit, but quite a different matter. Nor is there support for the majority's conclusion in reading the word "expansion" in its immediate statutory context. Even if to "commence operation" contemplated only a wholly new beginning  which we dispute  there is no question on this record that the major portion of the Blydenburgh Landfill in issue here (the unlined area) had been capped and closed, requiring a new beginning. Similarly, in the case before us there was substantial dispute as to whether area F  designated in the consent order to receive the ash  had ever operated as a landfill; at best it had not been used as a landfill for three or four years. (This facet of the consent order alone warrants the exploration and public scrutiny of the statutorily prescribed hearing.) Thus, it is obvious that even a vertical expansion may also entail a new beginning or commencement of operations; it does in the very case before us.
Reading the word "expansion" alone or in its immediate statutory context leads to only one conclusion: from the title on through, it is plain that the legislation was meant to curtail and close critically situated Long Island landfills, not to sanction their skyward expansion.
An administrative agency is of course bound by the statutory language, and cannot constrict, expand or interpret it in *311 ways not intended by the Legislature (see, e.g., Matter of Trump-Equitable Fifth Ave. Corp. v Gliedman, 57 N.Y.2d 588, 595; Matter of Jones v Berman, 37 N.Y.2d 42; see also, Boreali v Axelrod, 71 N.Y.2d 1). A statute circumscribes agency authority, not vice versa (see, e.g., Matter of McNulty v New York State Tax Commn., 70 N.Y.2d 788, 791). The majority places undue reliance on the DEC's reading of the statute, on its regulation, and on its apparent application of the regulation in one prior instance when it rejected Islip's application for a lateral expansion. There is no evidence in this record of any consistent pattern of application by the DEC of its cramped definition of "expansion"  even assuming that an agency's consistent interpretation can itself limit a statute (which it surely cannot).
The majority's conclusion that DEC's reading of the word "expansion" is reasonable in light of its technical expertise rests on an affidavit from one of DEC's engineers, simply asserting that "a vertical expansion, as opposed to a lateral expansion, does not pose a significant threat to the ground water because `recharge is among other things, a function of areal extent', and that there is a `reduced potential for leachate formation from a vertical versus a lateral expansion'." (Majority opn, at 303.) Such a downplaying of the environmental impact of vertical expansion, however, was directly contradicted by Islip's own 1985 environmental impact statement, also part of the record before us. In that document, prepared for a proposed lateral expansion, the Town itself pointed out that "a higher landfill is not an acceptable alternative," and it raised concerns incident to vertical expansion including "erosion of the landfill cap and an increase in attendant nuisances (exposure of buried garbage, odor, unattractiveness and repair costs)". Petitioners urge that in fact piling garbage on top of an already loaded site could substantially weaken the underlying barrier, thereby increasing the volume of leachate reaching the aquifer, and that the resulting increased volume acquires a higher concentration of contaminants as it is funneled through a higher mountain of garbage. While courts may not be best suited to resolving such highly technical disputes, and there is much to be said for recognizing the Commissioner's unquestioned expertness, still that is no basis for abdicating to the DEC and abandoning the clear mandate of the Legislature  to have such matters aired at public hearings where expert opinions can be confronted and challenged. This process neither eliminates nor undermines the *312 Commissioner's ultimate power to decide the most feasible means for waste disposal. To the contrary, the public participation contemplated by the statute enlightens and informs that decision.
Little need be said of the majority's conclusion that permitting this substantial expansion of a Long Island landfill to be accomplished by private agreement is actually consistent with the underlying purpose of a statute whose sole purpose is to direct their closure, forbid their expansion, and permit even limited expansion only after a public hearing and finding of no feasible alternative.
In view of the life-and-death importance of drinking water to Long Island residents, it is no surprise that the Legislature has provided them with an opportunity to be heard before a critically situated landfill may be expanded, and no surprise that well over 1,000 people in fact attended a hearing conducted by the Commissioner in connection with the Town's earlier effort to expand Blydenburgh. However desperate the Town's long-standing waste disposal problem may appear at this moment (compare, Flushing Natl. Bank v Municipal Assistance Corp., 40 N.Y.2d 731), it is indeed unfortunate that a way has been found to defeat the prescribed statutory procedure, and that it now receives this court's sanction.
We would reverse the Appellate Division order and grant the petition.
Order affirmed, with costs.
NOTES
[1] Respondents Town of Islip and Islip Resource Recovery Agency will be referred to collectively as Islip or the Town. Respondent Williams will be referred to as the Commissioner or DEC. Respondent Harrelson has defaulted and is not a party to this appeal.
[2] Petitioner and intervenor also contend that the consent order provision which allows the disposal of ashes in area F violates the Ashfill Law (L 1985, chs 358, 359), because area F is within 3,000 feet of a school. This argument is without merit. The Ashfill Law sets forth the procedure to be followed in the selection of a regional ashfill disposal facility for Nassau and Suffolk Counties. The 3,000-foot requirement only applies to prospective sites for this regional ashfill and has no relevance to local facilities (see, L 1985, ch 358, § 4 [2] [b] [iii], reprinted in McKinney's Cons Laws of NY, Book 17½, ECL 27-0704, 1988 Cum Ann Pocket Part).
[3] Notwithstanding petitioners' assertions and the suggestion to the contrary in the dissent, there is nothing in the May 12, 1987 order on consent or the record pertaining to the enforcement proceedings conditioning the vertical expansion on Islip's agreement to take the residue from the "infamous garbage barge" (see, dissenting opn, at 308). Indeed, the order on consent does not mention the garbage barge.
[4] ECL 27-0704 (3) provides: "On or after the effective date of this section and except as provided herein, no person shall commence operation, including site preparation, of a new landfill or of an expansion to an existing landfill which is located in a deep flow recharge area. However, the commissioner, after conducting a public hearing, may approve a limited expansion of any existing landfill in a deep flow recharge area for the sole purpose of providing for solid waste disposal capacity prior to the implementation of a resource recovery system. The commissioner shall not approve any such expansion unless he finds that the owner of such landfill is a municipality that is implementing a resource recovery system which is acceptable to the commissioner and which will be operational no later than seven years after the effective date of this section and that no other feasible means of solid waste management is available, taking into account technological, economic and other essential factors."
[5] The guidelines were drafted with input from the New York State Legislative Commission on Water Resource Needs of Long Island and after notice to the various towns. They were adopted after issuance of a negative declaration under SEQRA was published in the Environmental Notice Bulletin.