■ Roy C. Passantino et al., Respondents, v Board of Education of the City of New York, Appellant, et al., Defendant.—In a negligence action to recover damages for personal injuries, etc., defendant New York City Board of Education appeals from a judgment of the Supreme Court, Queens County, entered May 2, 1975, which is in favor of plaintiffs, upon a jury verdict. Judgment, insofar as it is in favor of plaintiff Robert Passantino, individually, affirmed, without costs or disbursements. Judgment, insofar as it is in favor of the infant plaintiff Roy Passantino, reversed, on the law, and, as between the infant plaintiff and the appellant, action severed and new trial granted with respect to the issue of damages only, with costs to abide the event, unless within 20 days after entry of the order to be made hereon, plaintiffs shall serve and file in the office of the clerk of the trial court a written stipulation consenting to reduce the verdict in his favor from $1,800,000 to $1,000,000, and to the entry of an amended judgment accordingly, in which event, the judgment in his favor, as so reduced and amended, is affirmed, without costs or disbursements. The findings of fact are affirmed. The amount of the verdict in favor of the infant plaintiff Roy Passantino was not warranted on this record and is excessive to the extent indicated herein. Margett, Damiani, Rabin and Shapiro, JJ., concur; Cohalan, Acting P. J., dissents and votes to reverse the judgment and to dismiss the complaint, with the following memorandum: The 18-year-old plaintiff, for one unfortunate moment, permitted his aggressiveness to overcome his common sense. As a result he is condemned, as a quadriplegic, to a life of complete helplessness, unable even to care for his most personal needs. However, in my judgment, and despite his pitiful plight, he neither proved the existence of any negligence on the part of the defendant board of education, nor of its agent, Coach La Velle, nor did he absolve himself of contributory negligence or overcome the fact that he assumed the risk. The complaint should have been dismissed, on the law, at the close of plaintiffs' case, or, in the alternative, at the close of the entire case. In 1974, at the age of 16, Roy Passantino (hereafter sometimes referred to as plaintiff), a junior in Newtown High School, was a regular on the varsity baseball team. He had been introduced to baseball at the age of 8, and from 13 on had been playing in team competition. He was the only junior among the varsity regulars. By the time he played high school baseball, he was well grounded in the fundamentals of the game, which included base running and the elements of sliding to bases. On the fateful day he had reached third base on a play with less than two out. La Velle, coaching at third base, called for a squeeze play. This required plaintiff to start for home plate as soon as the pitcher committed himself. It also meant that the batter would lay down a bunt so that, if successful, plaintiff would score standing up while the batsman was thrown out at first base. The batter, instead of bunting, took a full swing at the ball and missed. Passantino, running at full speed, had traversed 30 or 40 of the 90 feet between the third base and home plate. The catcher, in possession of the ball, stepped four or five feet down the third base line, blocking the plate—

as he had a right to do—and awaited the onrushing plaintiff. When he was about five feet from the catcher, plaintiff suddenly lowered his head, and, without slackening his pace, crashed into the catcher like a battering ram. Both went down. Only the catcher got up. Plaintiff was completely paralyzed. On the recitation of these facts alone, it would appear that plaintiff did not act as a reasonably prudent person should have acted under the circumstances. Who could have foreseen that he would perform such a foolish act? He could have attempted to retreat and engage in a rundown situation. He might have attempted to slide around the catcher, since a baserunner is allowed three feet on either side of the basepath within which to maneuver. Instead he chose the collision course, with its tragic consequences. In the complaint it is stated that "the aforesaid occurrence and the resultant injuries were caused solely and wholly by the negligence of the defendants". The complaint then goes on to allege, *inter alia:* 1. "that they [the defendants] carelessly and negligently trained, supervised, managed and controlled the said infant plaintiff and the activity involved;" and 2. "that they further failed to provide adequate and competent coaching". A third statement alleges: 3. "that they failed to properly teach and train the rudiments and fundamentals of the game of baseball." As to (1), Coach La Velle was in his 15th year as a teacher of physical education, had himself played baseball—and was in his second year of coaching it. As to (2) and (3), the plaintiff, at trial, admitted that La Velle and previous coaches had taught him the baseball fundamentals, most of which he had already known; and the accident, as described by Passantino himself, could not have been prevented if a multitude of supervisory personnel had been at hand (see *Frazier v Young Men's Christian Assn., Little Falls,* 286 App Div 464; *Minarovich v Board of Educ.,* 21 AD 853). To develop his allegations of negligence against the board of education, plaintiff testified that about two weeks before the tragic incident he had been involved in an allegedly similar play at home plate and had been congratulated by the coach (La Velle) for his actions at that time. As will be noted, the factual situation was completely different. On that prior occasion plaintiff was on third base and a teammate was on first. A signal was given to the runner on first to steal second. As he lit out for second, the catcher threw to the base. Passantino then broke for home. One of the infielders cut off the throw to second base and attempted to throw plaintiff out at home. As to that play, Passantino testified: "I was running and the catch was low. He [the catcher] was bent down to get it to the base and I had to knock him over." At an examination before trial, La Velle's recollection of the play was that plaintiff, who had been "in a semi-crouched position put his shoulder into the catcher and bowled him over. The catcher went down in a squat position catching a low ball." In the following answer, La Velle added, "I would say he knocked the ball loose or prevented the catcher from catching it." As a witness for the defendants at the trial itself the testimony of La Velle as to this incident was: "A run was scored at home plate. Roy scored. This was a play at the plate. It was fairly close, I presume—it was a year ago. Roy stood up and ran across the plate and touched it with his foot. The catcher may have been knocked over at the time." On that prior instance, Passantino, and not the catcher, was entitled to the basepath. The catcher was blocking the plate, but was not in control of the ball. Therefore, plaintiff, who had the right of way, was entitled to run into him—in order to touch home plate and to score the run. The situations, as noted, were not at all analogous. But in order to show that he was encouraged to do what he did, plaintiff said La Velle congratulated him for his action on the occasion of

the delayed steal. Passantino did not say so in so many words, but the strong implication was present (and the jury presumably so inferred) that he used his head as a battering ram on the day of his accident because the coach commended him on the prior occasion. It is important to realize that, unlike physical education courses in school, participation in interscholastic activity is a purely voluntary act. The great majority of accident cases involving schools deal with situations in a gymnasium during school hours. The instant event dealt with an extracurricular activity. The plaintiff assumed the risk of injury when he tried out for and played on the high school varsity team (see *McGee v Board of Educ.,* 16 AD2d 99; *Curcio v City of New York,* 275 NY 20). Dealing with this subject generally, Judge Cardozo wrote in *Murphy v Steeplechase Amusement Co.* (250 NY 479, 482): *"Volenti non fit injuria.* One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary, just as a fencer accepts the risk of a thrust by his antagonist or a spectator at a ball game the chance of contact with the ball". In relating the details of the prior incident, and in attempting to liken it to the facts at bar, the plaintiff built inference upon inference upon inference. The play was a completely different one (a delayed double steal, rather than a squeeze play). The ball was not in the complete possession of the catcher when plaintiff ran into him. Passantino had the right of way and the catcher was blocking the plate. If he hit the catcher at all, plaintiff did it with his shoulder and not with his head. If, on that occasion, Passantino had done something illegal, the umpire would have called him out, in which case La Velle would have had no reason to congratulate him. The inferences drawn, therefor, present as tenuous an argument as did the remarks of Stephen Douglas which Abraham Lincoln demolished by saying that they were "as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had starved to death".* Circumstantial evidence "consists in reasoning from facts which are known or proved, to establish such as are conjectured to exist; but the process is fatally vicious, if the circumstance from which we seek to deduce the conclusion depends itself upon conjecture" *(People v Kennedy,* 32 NY 141, 146). Before a Trial Judge allows circumstantial evidence to be received in evidence he should be satisfied that it is not too slight, remote or conjectural to have any legitimate influence in determining the fact in issue (see Richardson, Evidence [10th ed], § 147, p 117). The case of *Flansburg v Town of Elbridge* (205 NY 423) illustrates the danger of admitting evidence based on "similar" fact patterns. There, an accident occurred in September, 1908, after heavy rains. A horse and wagon overturned at a culvert. Plaintiff offered the testimony of a person who had been a victim in a "similar" accident at the same place, in December, 1907. At that time the road was covered with snow and ice. The horse and wagon overturned. Of these two "similar" occurrences, the court noted, in reversing a judgment for the plaintiff and remanding for a new trial (p 431): "This occurrence [of December, 1907] was under conditions wholly dissimilar to those attending the injuries to the plaintiff. Proving it did not tend to prove that the condition of the place of the accident to plaintiff made it dangerous at that time or ever before. The testimony did not impart to the jury any truth which justly or with fairness to the defendant should have entered into their deliberations and its admission was error" (matter in brackets supplied). A great deal of testimony was elicited during the trial on the question of sliding into bases. Plaintiff testified that Coach La Velle taught

---

* Lincoln-Douglas debate, Quincy, Ill., Oct. 13, 1858.

him how to slide (feet first), but that he never taught a head first slide. However, he added that he was never specifically told not to make a head first slide; nor was he told not to use his head as a battering ram. Just how far must a coach go in his instructions? Should La Velle have told plaintiff not to run into a wall or not to step into a hole on the playing field? If every negative possibility were to be discussed with the players, they would have to be placed in cotton batting to guard against all remote eventualities of harm. Moreover, the question of sliding is not at issue. The conceded fact is that Passantino did not slide. Had he done so, feet first, or head first, there is no indication, save by conjecture or surmise, that he would have suffered injury. A case surprisingly similar to that at bar—but concerned with the game of football, not baseball—is *Vendrell v School Dist. No. 26C, Malheur County* (233 Ore 1). There, in an inter-scholastic high school game, the 15-year-old plaintiff was carrying the ball from scrimmage as a halfback. The opinion of the seven man court *(en banc)* reads (p 6): "As a witness the plaintiff described as follows what happened: 'And I saw the Vale players in front of me and I knew I couldn't go any further so I put my head down and just ran into 'em and that is when I heard my neck snap.' At that moment he suffered the injury for which he seeks redress in damages. It consists of a fracture of the fifth cervical vertebra of the neck." The court further noted (p 9): "Since in junior high school he played the position of left half-back, the same as in the senior high school, he conceded that when he was injured he was playing that position for the third year." The opinion took note of a portion of the examination of the plaintiff (p 16): "Q At any time, in your coaching by Mr. Lovejoy or Mr. McGinley, were you ever told that you should either strike a dummy or an opposing player with your head? A No, but, see, I had done it in practice. In actual scrimmage. I had done that very same thing in practice—in scrimmage and nobody had ever told me any different." The court commented (pp 16–17): "But the plaintiff says that the defendant's coaches had not told him that if he used his head as a battering ram an injury might befall him. One of the first lessons that an infant learns when he begins to toddle about on his feet is not to permit his head to collide with anything. Not only do his parents, playmates and teachers unite in teaching him that lesson, but every door, chair and other protruding object that is in the child's presence becomes a harsh but effective teacher that injury occurs if he bumps his head upon something. Less than two weeks before his lamentable injury befell him, the plaintiff was taught the lesson again that he had learned in his infancy. This time it was taught to him when he ran head-on into a player in the Parma game and split his head gear. When he discarded his ruined helmet and borrowed one from a team mate he saw from the split helmet in his own hands what could have happened to his head. No coach could have spoken to him more effectively. * * * The defendant was not the plaintiff's employer or his master. Its coaches were his teachers. He had the right—in fact, the duty—to ask the coaches questions concerning any matter which was not clear, 38 Am Jur, Negligence, § 191, page 868. In turn, the coaches had the right to assume that he possessed the intelligence and stock of information of a normal young man, Harper and James, The Law of Torts, § 16.5, page 913. Thus, they had the right to assume that he knew of the possibility of injury that comes to an individual who uses his head as a battering ram." The court concluded by stating (p 19): "The defendant's motion for a directed verdict should have been sustained. The assignment of error reveals merit. The judgment of the circuit court is reversed, and the cause remanded for directions to enter judgment for the defendant." In addition to his assump-

tion of the risk by the voluntary action of ramming the catcher with a presumed knowledge of the danger involved, plaintiff was also guilty of contributory negligence. On that issue I would hold, as a matter of law, that any person acting as plaintiff acted on this occasion, was himself "solely and wholly" responsible for the accident and its unfortunate *sequelae*. That he was an infant in the eyes of the law—as dwelt upon at such length by his attorney in summation—does not alter the fact that he was 16 years old and an accomplished athlete; and that he was playing with his peers in size, strength and age. As much as I sympathize with his pitiful physical condition, I would reverse the judgment and dismiss the complaint as a matter of law, including, of course, the father's derivative action.