■ STEVEN MARK et al., Appellants, v COLGATE UNIVERSITY et al., Respondents, et al., Defendants.—In a negligence action to recover damages for personal injuries, etc., plaintiffs appeal from a judgment of the Supreme Court, Westchester County, entered November 2, 1972, which is in favor of the respondents, upon a jury verdict. Judgment reversed, on the law, and new trial granted, with costs to abide the event. No issues have been raised with respect to the fact findings. For the second time in less than two months this court is confronted with the tragic situation of a young man who has been seriously injured while participating in an interscholastic sport (see *Passantino v Board of Educ.,* 52 AD2d 935). In September, 1965 Steven Mark (hereafter plaintiff) entered Colgate University and, shortly

thereafter, tried out for and made the freshman football team. On September 27, 1965 the plaintiff was playing the position of defensive halfback during a practice scrimmage. In attempting to execute a tackle on a fellow teammate he sustained serious injuries to his spinal cord, which resulted in permanent quadriplegia. With the exception of Everett Barnes, all of the individual defendants were members of the Colgate football coaching staff at the time in question. The basic position taken by the plaintiff at the trial was that the method of tackling taught by the defendants, commonly referred to as a "head tackle", was unnecessarily dangerous and enhanced the normal risks attendant to participation in this often-violent sport. Each side called an impressive array of distinguished coaches and former players who, as experts, gave their opinions as to the relative safety and use of the head tackle vis-à-vis the shoulder tackle. There was a wide variance of opinion, not only on this subject, but also as to whether the precise method of head tackling taught at Colgate was in accord with the head tackling method being taught at a number of other institutions across the country, and as to the exact manner in which the accident occurred. During the fourth week of trial an incident, which can only be described as regrettable and unfortunate, occurred. The plaintiffs' attorney, Mr. Geoghan, was cross-examining one of the expert witnesses called by the defendants. Defense counsel objected to a certain question posed by Mr. Geoghan to the witness. Mr. Geoghan's retort and the subsequent vehement outburst of a juror in response to the statement made by plaintiff's attorney can be only described if set forth in full: "Mr. Wilson: I object to that, a direct misquotation. Mr. Geoghan: It is not a direct misquotation. I will read from the examination before trial and if you are going to interrupt me I'm going to stay here for three weeks. Juror No. 2: I am not going to stay here, that's for sure; not three weeks. I am not going to stay. The Court: Please. Juror No. 2: Go into a recess. I don't care. When you say you are going to stay three weeks, I am not. The Court: Juror No. 2—Mr. Geoghan: May we have a recess, sir? Juror No. 2: I won't stay three weeks, not with you, no, sir. The Court: Mr. Velardi, just a moment. Just calm yourself. We are—Juror No. 2: He is almost hitting me on the head this morning, and I got to keep quiet? The Court: We are not going to be here for three more weeks. Calm yourself. Juror No. 2: He was leaning over here. He almost hit me in the head. The Court: Mr. Velardi, please. Juror No. 2: Don't look at me. The Court: We will take a recess. Mr. Geoghan: I want to go into chambers. The Court: Let me run the court, Mr. Geoghan. Now, stay where you are, please. The jury may pass out. Have a nice, leisurely lunch. Juror No. 2: He almost hit me in the head." The trial court then ordered a recess and Mr. Geoghan, out of the presence of the jury, made an application to remove Juror No. 2 from the panel and to replace him with one of the alternate jurors. When defense counsel objected, the court, without conducting any inquiry of the juror, denied the motion. Thereafter, the Trial Judge allowed the attorneys to argue the matter further in chambers. At that time the court's attention was drawn to CPLR 4106, which governs the replacement of regular jurors with alternates. Nevertheless, the court adhered to its original determination, taking the position that the present situation did not come within the provisions of that section and "that this is not a matter in which the Court may exercise any discretion." This was error. CPLR 4106 provides, in relevant part, "If, before the final submission of the case, a regular juror dies, or becomes ill, *or for any other reason is unable to perform his duty,* the court may order him to be discharged and draw the name of an alternate, who shall replace the discharged juror in the jury box" (emphasis

supplied). It is clear that the situation involved herein can only come within the general exception created by the statute. The parties have not cited, nor has this court been able to find, any cases construing this statute. Hence there must be a resort to the established rules of statutory construction. Respondents argue that the rule of *ejusdem generis* requires a holding that the phrase "or for any other reason" must be construed to mean any other reason similar to death or illness. However, the rule of *ejusdem generis* is only a rule of construction; it must yield to the Legislature's evident purpose in enacting the statute (see *Matter of Blatnicky v Ciancimino,* 1 AD2d 383, affd 2 NY2d 943; 56 NY Jur, Statutes, § 131). In enacting CPLR 4106 the Legislature obviously intended to provide a mechanism for the prevention of mistrials by vesting broad discretion in a Trial Judge to substitute an alternate juror for a regular juror who is unable to continue to serve because of some physical or mental disability, or because he has evinced a certain bias or prejudice against one of the parties. Certainly, where a substantial investment in terms of time and money has been made by all parties concerned, the fortuitous death or illness of a juror should not require the holding of a new trial. Similarly, the substantial misconduct of a single juror, while perhaps not so grave as to prejudice the entire panel and thereby require a mistrial, should not render nugatory the entire proceedings. Nor do we believe that the Legislature intended such a result. Indeed, the few cases which have been decided under virtually identical statutes have come to the same conclusion (see *People ex rel. Adams v Moran,* 35 Misc 2d 1078, affd 18 AD2d 802, affd 13 NY2d 660; *People v Abbott,* 47 Cal 2d 362). Accordingly, we hold that the situation at bar comes within the ambit of CPLR 4106. Although the trial court did not reach this issue, we also find that the vehemence and hostility exhibited by the juror toward the plaintiff's attorney was of such a nature as to require his removal. On this ground alone a new trial should be had (cf. *Payne v Burke,* 236 App Div 527). We also find as erroneous a number of the trial court's rulings which precluded the use of certain literature during the cross-examination of the defendants' experts. During the course of the trial two pamphlets, written and published under the auspices of the American Medical Association's Committee on the Medical Aspects of Sport, were marked for identification at the request of plaintiff's attorney. In general, those articles condemned the practice of "spearing" (the "intentional act of using a helmeted head to block, tackle, or otherwise punish an opponent"). However, each time the plaintiff's attorney attempted to confront the defendants' experts with those pamphlets, the trial court sustained the defense counsel's objections. It is well settled that on cross-examination an expert may, for impeachment purposes, be confronted with a passage from a treatise or book of recognized authority which is at variance or in conflict with the opinion previously expressed by the witness on the stand (see *People v Feldman,* 299 NY 153; *Hastings v Chrysler Corp.,* 273 App Div 292). Significantly, this practice is not limited to those cases in which the expert admits that he has read the book or article concerning which he is being questioned. However, in order to lay a proper foundation for the use of such material on cross-examination, the witness must concede its authoritativeness (see *Roveda v Weiss,* 11 AD2d 745; *Hastings v Chrysler Corp., supra;* Richardson, Evidence [Prince, 10th ed], § 373). We do not pass upon other specifications of alleged error as we assume they will not recur upon the new trial. Martuscello, Acting P. J., Damiani and Shapiro, JJ., concur; Cohalan and Titone, JJ., concur in the result, with the following memorandum: We would reverse and remand for a new trial solely on the ground that the trial court committed error in

denying the motion of the plaintiffs to discharge Juror No. 2 and to replace him with an alternate juror. As noted in the final sentence of CPLR 4106 (Alternate jurors): "If, before the final submission of the case, a regular juror dies, or becomes ill, *or for any other reason is unable to perform his duty,* the court may order him to be discharged and draw the name of an alternate, who shall replace the discharged juror in the jury box, and be treated as if he had been selected as one of the regular jurors" (emphasis supplied). The outburst by Juror No. 2, directed as it was at plaintiffs' trial attorney, evinced a bias that seriously jeopardized plaintiffs' chances of success in the outcome of the trial. The trial court should have granted the motion to substitute or, at the very least, should have conducted an *in camera* inquiry as to bias and possible prejudice (see *People v Abbott,* 47 Cal 2d 362). As we view it, the fact situation at bar falls within the compass of the clause "or for any other reason is unable to perform his duty", as stated in CPLR 4106. The trial tactic of plaintiffs' counsel in failing to move for a mistrial should not militate against his clients. The trial had been in progress for about three weeks at that point, with attendant costs and the heavy expenses incurred in producing expert witnesses to support plaintiffs' causes of action.