OPINION OF THE COURT
Richard B. Meyer, J.
Consolidated proceeding pursuant to CPLR article 78 challenging a determination by the respondent Adirondack Park Agency (Agency) dated March 25, 2008 which, inter alla, directed petitioner Lewis Family Farm, Inc. (LFF) to apply to the Agency for a permit for three new single-family dwellings and a four-lot subdivision, pay a $50,000 civil penalty, and not to occupy the dwellings until a permit was issued, and an action by the Agency to enforce the determination and enjoin LFF from working on or using the dwellings and further violating the Executive Law.
I. Factual Background
The essential facts are, for the most part, not in dispute. LFF owns and operates an eleven hundred acre organic farm in the Town of Essex, Essex County, New York designated as a single parcel of land on the official county tax maps and town tax rolls. The property lies wholly within the Adirondack Park and within Essex County Agricultural District No. 4. The subject parcel is classified on the Adirondack Park Land Use and Development Plan Map as resource management, rural use and hamlet. In or about November 2006, LFF commenced construction of three single-family dwelling units, to be used by employees working on the farm, on a portion of its property classified as resource management, one of which would replace an *570 adjacent preexisting dwelling scheduled for removal upon completion of the new homes. The dwellings are arranged in a cluster at a site located immediately north and east of the intersection of Whallons Bay Road and Christian Road, and approximately 800 feet (but less than one quarter of a mile) from the Boquet, also known as Bouquet River, a designated recreational river (ECL 15-2714 [3] [e]) under the Wild, Scenic and Recreational Rivers System Act (Rivers Act) (ECL 15-2701 et seq.).
Subsequently, on March 14, 2007, LEE submitted an application to the Agency seeking a permit to construct “three single family dwellings in a farm compound to be used by farm employees exclusively.” The next day, the Agency issued a notice of incomplete application and requested additional information. Over the next three months, the parties and their representatives engaged in unsuccessful negotiations over disputed issues, including the Agency’s threatened enforcement action and a proposed settlement agreement (9 NYCRR 581-2.5) which called for LEE to apply for after-the-fact permits for the subdivision and the single-family dwellings, as well as pay a $10,000 civil penalty. On June 27, 2007, the Agency’s acting executive director issued a cease and desist order (9 NYCRR 581-2.4) to LEE prohibiting “any and all land use and development related to the construction of the single family dwellings . . . until this matter is resolved and the enforcement case is concluded.” The following day, LEE commenced a declaratory judgment action against the Agency challenging jurisdiction.
After LEE filed an amended complaint and applied for a temporary restraining order, the parties exchanged motions to dismiss under CPLR 3211. LEE claimed the Agency lacked jurisdiction over its farm worker housing project because the structures were “agricultural use structures” (Executive Law § 802 [8]) in a “resource management area” (Executive Law § 805 [3] [g]), and also that any assertion of jurisdiction by the Agency violated Agriculture and Markets Law § 305-a. The Agency, citing CPLR 7801 (1), moved to convert the action to an article 78 proceeding and for dismissal on the grounds that the action was “premature and not ripe for judicial review because the State defendant has not issued a final determination,” and for failing to state a cause of action “because Agriculture and Markets Law § 305-a does not preclude the APA from requiring a permit for subdivision of land and construction of single family dwellings.” On August 16, 2007, Supreme Court (Ryan, J.) *571 dismissed the proceeding as premature and not ripe for judicial intervention, and also held that Agriculture and Markets Law § 305-a did not apply to a state agency. LFF filed a notice of appeal, and the appeal is pending.
Following dismissal of the converted article 78 proceeding, LFF continued to construct the single-family dwellings. One of the Agency’s associate attorneys served a letter on LFF’s counsel on August 31, 2007 advising that the previous cease and desist order remained in effect. On or about September 2, 2007, the Agency’s acting executive director issued a notice of apparent violation (9 NYCRR 581-2.3), thereby initiating an enforcement proceeding before the Agency’s enforcement committee (9 NYCRR 581-2.6 [b]).
The enforcement committee, consisting of six of the Agency’s 11 members (Executive Law § 803), convened on March 13, 2008 to “hear an oral presentation or argument by the agency’s staff and by the respondent and deliberate in executive session and subsequently make a determination as provided in” 9 NYCRR 581-2.6 (d) (record document No. 2 at 2). Also in attendance were the remaining five members of the Agency. In that hearing, Agency staff conceded that LFF was “clearly using the land for agricultural use purposes,” and that “[t]he agricultural use of resource management lands is listed by law as a primary compatible use and does not require an agency permit” (id. at 6). Staff argued, however, that a “single family dwelling” could not be an “agricultural use structure” under the Adirondack Park Agency Act (APA Act) (Executive Law art 27; record document No. 2 at 8, 13), and that, therefore, permits for the three single-family dwellings on land classified as resource management, as well as for subdivision of that land, were required under the APA Act and the Rivers Act (id. at 7-11). In so concluding, Agency staff contended that statutory construction favored specific over general definitions, and that the APA Act’s definition of a “single family dwelling” was specific, while that of “agricultural use structure” was general (id. at 10). Staff also asserted that because the APA Act’s definition of “principal building” included reference to both agricultural use structures and single-family dwellings, the Legislature intended them to be “separate and different types of structures for purposes of agency jurisdiction” (id. at 11). Counsel for LFF argued that the language of the APA Act supported a conclusion that a single-family dwelling used for agricultural purposes could be an agricultural use structure and exempt from Agency jurisdic *572 tian. Moreover, no subdivision permit would be required since the three dwellings would constitute a single principal building under the APA Act.
On March 25, 2008, the Agency’s enforcement committee, made up of a quorum of the Agency (Executive Law § 803), issued a unanimous determination (the Agency’s determination) that LFF violated the APA Act by failing to obtain a subdivision permit and a permit authorizing construction of two of the dwelling units. Since the determination was approved by the “affirmative vote by a majority of the members of the agency” (Executive Law § 803), it constitutes an action by the Agency (id.; see also General Construction Law § 41; Rockland Woods v Incorporated Vil. of Suffern, 40 AD2d 385 [1973]). In arriving at its determination, the Agency held that “farm worker dwellings are ‘single family dwellings’ (or possibly ‘multiple family dwellings’ or ‘mobile homes,’ depending upon the type of dwelling structure), and not ‘agricultural use structures’ ” under the APA Act (record document No. 1 at 8). The Agency also determined that the APA Act’s definition of “ ‘agricultural use structures’ does not include, and was not intended to include, the farm owners’ or farm workers’ dwellings,” was only “intended to include other structures of an accessory nature” (id. at 9), and that single-family dwellings and agricultural use structures “are treated as separate and distinct uses under the . . . [APA] Act” (id.). Based upon its finding of violations, the Agency directed LFF to pay a $50,000 civil penalty, apply for a permit for three new dwellings and a four-lot subdivision no later than April 14, 2008 by submitting a major project application and reply to requests for additional information within 30 days of receipt. Additionally, LFF was directed to submit to the Agency no later than April 28, 2008 a detailed description of the use of each dwelling and its connection to agricultural operations plus as-built plans for the septic system and an evaluation by a state-licensed professional engineer regarding whether the installed septic system shared by the three dwellings complied with State Department of Health and Agency standards and guidelines. Finally, the Agency’s determination provided that LFF relinquished its right to challenge Agency jurisdiction but retained the limited right to appeal the project review process, and prohibited LFF from occupying the three new buildings until permits were issued and the penalty paid.
*573 II. Procedural History
LFF commenced this article 78 proceeding on April 8, 2008, and sought a stay of enforcement of the Agency’s determination. Following oral argument, this court granted a partial stay on April 11, 2008. Specifically, a stay was granted as to enforcement of the Agency’s determination except for the prohibition against occupying the dwellings and payment of the civil penalty. That same day, the Agency commenced the enforcement action by filing a summons and complaint. LFF served an amended petition on April 14, 2008. It also moved to consolidate the two cases, which motion was granted without opposition on April 24, 2008. An order of consolidation was issued on June 10, 2008. Meanwhile, LFF paid the civil penalty into court (CPLR 2601) and the Agency served an amended complaint for enforcement on May 14, 2008.
The parties thereafter filed motions addressed to the pleadings. The Agency sought dismissal of at least some of LFF’s article 78 claims on the grounds of, among other things, collateral estoppel. LFF moved to dismiss the Agency’s causes of action against certain individual defendants. By decision and order dated July 2, 2008 (20 Mise 3d 1114[A], 2008 NY Slip Op 51348DJ] [2008]), this court dismissed two of LFF’s causes of action but denied all other relief sought by the Agency. As to LFF’s motion, the court dismissed the Agency’s causes of action against the individual defendants, thereby removing them from the case.
The Agency then filed an answer and return (CPLR 7804 [e]) in response to LFF’s article 78 claims. The parties also each filed motions for summary judgment relative to the Agency’s causes of action for enforcement of the Agency’s determination.
III. Scope of Review
Judicial review of the determination of an administrative agency under CPLR article 78 is limited to whether the challenged decision “was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion” (CPLR 7803 [3]). Such review is further restricted
“solely to the grounds invoked by the agency, and if those grounds are insufficient or improper, the court is powerless to sanction the determination by substituting what it deems a more appropriate or proper basis (.Matter of Montauk Improvement v *574 Proccacino, 41 NY2d 913; Matter of Barry v O’Connell, 303 NY 46; see, also, Securities Comm, v Chenery Corp., 332 US 194)” (Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 57 NY2d 588, 593 [1982]; see also Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs., 77 NY2d 753 [1991]; Matter of Aronsky v Board of Educ., Community School Dist. No. 22 of City of N.Y., 75 NY2d 997 [1990]; Matter of Parkmed Assoc, v New York State Tax Commn., 60 NY2d 935 [1983]).
LFF’s article 78 claims rest upon the interpretation of certain statutory provisions in the APA Act, and therefore only involve questions of law for determination by this court.
With regard to the parties’ respective motions for summary judgment directed to the Agency’s enforcement claims, it is well-settled that summary judgment “is considered a drastic remedy which should only be employed when there is no doubt as to the absence of triable issues (Millerton Agway Coop. v. Briarcliff Farms, 17 NY2d 57)” (Andre v Pomeroy, 35 NY2d 361, 364 [1974]). In order for a party to be entitled to summary judgment, “it must clearly appear that no material and triable issue of fact is presented (Di Menna & Sons v. City of New York, 301 N. Y. 118)” (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957]).
“To obtain summary judgment it is necessary that the movant establish his cause of action or defense ‘sufficiently to warrant the court as a matter of law in directing judgment’ in his favor (CPLR 3212, subd [b]), and he must do so by tender of evidentiary proof in admissible form” (Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067 [1979]). “Accordingly, if the movant does not submit sufficient evidence on a particular issue or cause of action to justify judgment as a matter of law, the burden never shifts to the adversary to submit evidence sufficient to raise a triable issue of fact (see Alvarez v Prospect Hosp., 68 NY2d 320) . . . [e]yen where there is no opposition” (Zecca v Riccardelli, 293 AD2d 31, 34 [2002]).
Based upon all of the papers and proof submitted there are no issues of fact requiring trial, and judgment as a matter of law in favor of a party is warranted (CPLR 3212 [b]) relative to the Agency’s causes of action to enforce its March 25, 2008 determination.
*575 IV The Adirondack Park Agency Act
The APA Act establishes a comprehensive scheme for land use and development of all lands, but particularly those privately owned, lying within the six million acre Adirondack Park (Executive Law §§ 801, 802 [1]). All lands within the Adirondack Park are classified into one of six distinct land use categories — hamlet, moderate intensity use, low intensity use, rural use, resource management, and industrial use (Executive Law § 805 [3] [a]-[h]). The lands in each land use classification are designated on the official Adirondack Park Land Use and Development Plan Map approved by the State Legislature in 1973 (L 1973, ch 348; Executive Law § 805 [2] [b]). The Adirondack Land Use and Development Plan (the plan) sets forth the specific “compatible uses,” consisting of primary and secondary uses, and “overall intensity guidelines” for each land use area (Executive Law § 805 [3] [a]-[h]). The Agency has exclusive
“jurisdiction to review and approve all class A regional projects, including those proposed to be located in a land use area governed by an approved local land use program, and all class B regional projects in any land use area not governed by an approved . . . local land use program” (Executive Law § 809 [1]).
Class A and class B regional projects for each of the six types of land use areas are specified by statute (Executive Law § 810). “Any person proposing to undertake” such a project must “make application to the agency for approval of such project and receive an agency permit therefor prior to undertaking the project” (Executive Law § 809 [2] [a]).
The APA Act defines an “agricultural use structure” as “any barn, stable, shed, silo, garage, fruit and vegetable stand or other building or structure directly and customarily associated with agricultural use” (Executive Law § 802 [8]). A “structure” is defined to include “single family dwellings” (Executive Law § 802 [62]). A “single family dwelling” is “any detached building containing one dwelling unit, not including a mobile home” (Executive Law § 802 [58]).
“ ‘Agricultural use’ means any management of any land for agriculture; raising of cows, horses, pigs, poultry and other livestock; horticulture or orchards; including the sale of products grown or raised directly on such land, and including the construction, alteration or maintenance of fences, agricul *576 tural roads, agricultural drainage systems and farm ponds” (Executive Law § 802 [7]).
Under the statutory scheme, “Agricultural uses” and “Agricultural use structures” in resource management areas do not require a permit from the Agency (Executive Law § 805 [3] [g] [4] [1], [2]) because they are primary compatible uses which are neither class A nor B regional projects (Executive Law § 810 [1] A; [2] [d]; see also 9 NYCRR 577.4 [b] [3] [ii]; 577.6 [b] [3] [no permit required for agricultural use structures in recreational river areas unless located “inside the mean high water mark of the river or within 150 feet of the mean high water mark”]). However, a “single family dwelling” in a resource management area requires a permit from the Agency as a class B regional project (Executive Law § 810 [2] [d] [1]) provided there is no approved local land use program, which in the case at bar there is not.
The plan also designates as class A regional projects in a resource management area, subject to exclusive Agency review and approval, “all subdivisions of land located . . . within one-quarter mile of rivers navigable by boat designated to be studied as . . . recreational” under the Rivers Act, and “[a]ll subdivisions of land (and all land uses and development related thereto) involving two or more lots, parcels or sites” (Executive Law § 810 [1] [e] [1] [a]; [3]). A “subdivision” under the APA Act is defined as
“any division of land into two or more lots, parcels or sites, whether adjoining or not, for the purpose of sale, lease, license or any form of separate ownership or occupancy (including any grading, road construction, installation of utilities or other improvements or any other land use and development preparatory or incidental to any such division)” (Executive Law § 802 [63]).
Under the Agency’s regulations, a subdivision into sites occurs
“whether or not a legal conveyance has or will be executed . . . where one or more new dwelling(s) or other principal building(s) is to be constructed on a parcel already containing at least one existing dwelling or other principal building, and regardless of whether the existing building is proposed to be removed after completion of the new building(s)” (9 NYCRR 570.3 [ah] [3] [ii]).
Although a single-family dwelling generally constitutes one *577 principal building (Executive Law § 802 [50] [a]), the APA Act provides that “all agricultural use structures and single family dwellings or mobile homes occupied by a farmer of land in agricultural use, his employees engaged in such use and members of their respective immediate families, will together constitute and count as a single principal building” (Executive Law § 802 [50] [g]).
Resolution of the parties’ competing claims thus centers on whether the three single-family dwellings serving as farm worker housing constitute “agricultural use structured ” (Executive Law § 802 [8]) under the APA Act. Thus, if a “single family dwelling” can be an “agricultural use structure” under the APA Act, LFF’s three-dwelling farm worker housing project represents exempt “agricultural use structures” (Executive Law § 810 [1] [e]; [2] [d]; 9 NYCRR 577.4 [b] [3] [ii]; 577.6 [b] [3]) not subject to Agency jurisdiction, and together with the dwelling to be removed “constitute and count as a single principal building” (Executive Law § 802 [50] [g]) such that no subdivision requiring an Agency permit has or will occur as a result of their construction.
V Construction of the APA Act
“It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature” (Patrolmen’s Benevolent Assn, of City of N.Y. v City of New York, 41 NY2d 205, 208 [1976]; see also Riley v County of Broome, 95 NY2d 455, 463 [2000]; Longines-Wittnauer Watch Co. v Barnes & Reinecke, 15 NY2d 443, 453 [1965]). “As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof.” (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998].)
“[I]f the language of a statute is plain and unambiguous, there is neither need nor warrant to look elsewhere for its meaning. (See, e.g., Meltzer v. Koenigsberg, 302 N. Y. 523, 525; Town of Putnam Valley v. Slutzky, 283 N. Y. 334, 343; McCluskey v. Cromwell, 11 N. Y. 593, 601-602.)” (Matter of Roosevelt Raceway v Monaghan, 9 NY2d 293, 304 [1961].)
“In construing statutes, it is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or contradiction, there is no room for construction and courts *578 have no right to add to or take away from that meaning” (Tompkins v Hunter, 149 NY 117, 122-123 [1896]; see also Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98 [1997]).
“Under the doctrine of separation of powers, courts may not legislate (.Bright Homes v Wright, 8 NY2d 157, 162; Matter of Metropolitan Life Ins. Co. v Boland, 281 NY 357, 361), or rewrite (Matter of Chase Nat. Bank v Guardian Realties, 283 NY 350, 360; Matter of Tormey v LaGuardia, 278 NY 450, 451), or extend legislation (People ex rel. Newman v Foster, 297 NY 27, 31; Matter of Hogan v Supreme Ct., 281 NY 572, 576)” (.Matter of Malpica-Orsini, 36 NY2d 568, 571 [1975]).
In enacting the APA Act, the Legislature created a comprehensive and integrated statutory scheme to protect and preserve the natural resources of the Adirondack Park (Executive Law § 801). In so doing, the Legislature specifically defined 68 different words and phrases (Executive Law § 802) commonly used throughout the APA Act, with the obvious purpose and intent that those definitions consistently and unvaryingly be applied in the administration and enforcement of the entire APA Act. Thus, in construing any one statutory definition resort must necessarily be made to any other statutorily defined term or phrase contained within that definition.
“A court must consider a statute as a whole, reading and construing all parts of an act together to determine legislative intent (see McKinney’s Gons Laws of NY, Book 1, Statutes § 97), and, where possible, should ‘harmonize[ ] [all parts of a statute] with each other . . . and [give] effect and meaning ... to the entire statute and every part and word thereof (id. § 98; see also People v Mobil Oil Corp., 48 NY2d 192, 199 [1979] . . . )” (Friedman v Connecticut Gen. Life Ins. Co., 9 NY3d 105, 115 [2007]).
Inapplicable here is the general rule that “courts should defer to the interpretation given a statute by the agency charged with its enforcement if the interpretation is neither irrational, unreasonable, nor inconsistent with the governing statute (Matter of Fineway Supermarkets v State Liq. Auth., 48 NY2d 464; Matter of Sigety v Ingraham, 29 NY2d 110)” (Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 57 NY2d 588, 597 [1982]). No deference is accorded to an agency’s determination where a court “is faced with the interpretation of statutes and pure *579 questions of law” (.Matter of Madison-Oneida Bd. of Coop. Educ. Servs. v Mills, 4 NY3d 51, 59 [2004]).
“Where . . . the words of the statute are clear and the question simply involves the proper application of the provision ‘there is little basis to rely on any special competence or expertise of the administrative agency and its interpretive regulations’, especially when the interpretation . . . directly contravenes the plain words of the statute (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459)” (Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 57 NY2d at 597; see also Matter of Sweeney v Dennison, 52 AD3d 882 [2008]).
Contrary to the Agency’s determination, the statutory language cannot be interpreted or construed to evidence a legislative intent that the word “structure” in the definition of “agricultural use structure” (Executive Law § 802 [8]) means an “accessory structure.” The Legislature enacted a separate definition of “accessory structure” (Executive Law § 802 [5] [“any structure or a portion of a main structure customarily incidental and subordinate to a principal land use or development and that customarily accompanies or is associated with such principal land use or development, including a guest cottage not for rent or hire that is incidental and subordinate to and associated with a single family dwelling”]). Yet, the Legislature chose not to use that more limited term in its definition of “agricultural use structure” (Executive Law § 802 [8]). A “court should not ignore the words of a statute, clear on its face, to reach a contrary result through judicial interpretation (McKinney’s Cons Laws of NY, Book 1, Statutes, § 76; Matter of Kleefeld, 55 NY2d 253, 259)” (Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 57 NY2d at 597). To accept the Agency’s interpretation that the term “structure” in the definition of “agricultural use structure” should be read to mean “accessory structure” renders the term “structure” “superfluous and redundant in the statute . . . [and] would deprive the term of its own separate meaning” (Matter of SIN, Inc. v Department of Fin. of City of N.Y., 71 NY2d 616, 621 [1988]). “ ‘The failure of the Legislature to include a matter within a particular statute is an indication that its exclusion was intended’ (Pajak v Pajak, 56 NY2d 394, 397, citing McKinney’s Cons Laws of NY, Book 1, Statutes § 74)” (People v Tychanski, 78 NY2d 909, 911-912 [1991]). Clearly, had the Legislature intended to limit “agricultural use structures” to “accessory structures” and preclude a *580 single-family dwelling from qualifying as an “agricultural use structure,” it would have done so by inserting appropriate language readily at hand, including using its own definition.
The Agency’s reliance upon the rule of ejusdem generis — that general language in a statute is limited by the specific phrases which precede it (Statutes § 239 [b]; Barsh v Town of Union, 126 AD2d 311, 313 [1987]) — is misplaced. As a rule of statutory construction, resort to the rule is to be made only where the language is unclear and ambiguous.
“Where the language is definite and has a precise meaning, it must be presumed to declare the intent of the legislature, and it is not allowable to go elsewhere in search of conjecture to restrict or extend the meaning . . . and courts cannot go beyond or outside of it under pretext of interpretation to cure any supposed blunder of the legislature” (<-Johnson v Hudson Riv. R.R. Co., 49 NY 455, 462 [1872]).
This is particularly true where the terms have specific, definite meanings — such as the terms here — for in such a case “there is no room for construction and courts have no right to add to or take away from that meaning” (Tompkins v Hunter, 149 NY 117, 123 [1896]; see also People v Torres, 184 Mise 2d 429, 432 [2000]).
Moreover,
“[t]he rule of ejusdem generis is only a rule of construction that must yield to the evident purpose of the Legislature in enacting . . . statutes, for that rule of construction is controlled by another rule that statutes should be construed to carry out the objects sought to be accomplished by them (People v. Kaye, 160 App. Div. 644, 647, affd. 212 N. Y. 407, 411, motion for reargument denied 213 N.Y. 648)” (Matter of Blatnicky v Ciancimino, 1 AD2d 383, 388 [1956], ajfd 2 NY2d 943 [1957]; see also Mark v Colgate Univ., 53 AD2d 884 [1976]).
It is rational to conclude that the Legislature intended single-family dwellings “directly and customarily associated with agricultural use” (Executive Law § 802 [8]) to be exempt from Agency jurisdiction in resource management areas. Though not controlling here, farm residential buildings have been held to constitute “farm operations” exempt from town zoning regulations under Agriculture and Markets Law § 305-a (Town of Lysander v Hafner, 96 NY2d 558, 562 [2001]). In so holding, the *581 Court in Lysander relied upon the Legislature’s recognition that residential buildings on a farm “ ‘contribute to the production, preparation and marketing of crops, livestock and livestock products as a commercial enterprise’ (Agriculture and Markets Law § 301 [11])” (id.). There is no reason to conclude that the Legislature intended anything different inside the Adirondack Park.
The Legislature’s stated purposes, policies and objectives of resource management areas include encouraging “proper and economic management of . . . agricultural . . . resources” and allowing “for residential development on substantial acreages or in small clusters on carefully selected and well designed sites” (Executive Law § 805 [3] [g] [2]). These goals are consistent with “[t]he policy of the state . . . to . . . encourage the development and improvement of its agricultural lands for the production of food and other agricultural products” (NY Const, art XIY § 4). Also, the purpose and objective of “residential development ... in small clusters” provides the rationale for the Legislature’s decision that “all agricultural use structures and single family dwellings or mobile homes occupied by a farmer of land in agricultural use, his employees engaged in such use and members of their respective immediate families, will together constitute and count as a single principal building” (Executive Law § 802 [50] [g]) so that Agency jurisdiction over “subdivisions” is not invoked by such a development.
While LFF’s farm worker housing project represents a unique and unprecedented effort to provide agricultural workers with quality housing and may not have been foreseen by the Legislature, “[a] statute must be read and given effect as it is written by the Legislature, not as the court may think it should or would have been written if the Legislature had envisaged all the problems and complications which might arise in the course of its administration” (Lawrence Constr. Corp. v State of New York, 293 NY 634, 639 [1944]). To the extent that LFF’s project is an unforeseen event, any change in interpretation or application of the APA Act “is a matter of policy to be determined by the Legislature rather than by the courts under the guise of construction. (People v. Friedman, 302 N. Y. 75, 79.)” (Buduson v Curtis, 285 App Div 517, 520 [1955], affd 309 NY 879 [1955].) “[0]missions in a statute . . . cannot be supplied by construction” (Eastern Paralyzed Veterans Assn, v Metropolitan Transp. Auth., 79 AD2d 516, 517 [1980], appeal dismissed 52 NY2d 895 [1981]) and may only “be remedied by the Legislature, and not *582 by the courts” (McKinney’s Cons Laws of NY, Book 1, Statutes § 363, at 525).
Also without merit is the Agency’s determination that single-family dwellings and agricultural use structures “are treated as separate and distinct uses under the . . . [APA] Act”; in other words, the two terms are mutually exclusive. Certainly, under the APA Act not all “agricultural use structures” are “single family dwellings,” and not all “single family dwellings” are “agricultural use structures.” The definition of “agricultural use structure” is much broader in scope, ranging from a “barn, stable, shed, silo, [and] garage” to a “fruit and vegetable stand” to any “other building or structure directly and customarily associated with agricultural use” (Executive Law § 802 [8]). There is nothing in the APA Act which precludes a “single family dwelling” “directly and customarily associated with agricultural use” (Executive Law § 802 [8]) from qualifying as an “agricultural use structure.”
“Statutes . . . should be read and understood . . . without resorting to subtle and forced construction for the purpose of either limiting or extending their operation. Courts cannot correct supposed errors, omissions or defects in legislation . . . The office of interpretation is to bring sense out of the words used, and not bring a sense into them” (McCluskey v Cromwell, 11 NY 593, 601-602 [1854]).
It is because the Legislature recognized that “agricultural use structures” covered a wide range of structures, that single-family dwellings would qualify as agricultural use structures only on rare occasions, and that farm worker housing would appear most often in the form of temporary buildings such as mobile homes — a residential unit specifically excluded from the definition of “single family dwelling” (Executive Law § 802 [58]) — that it separately listed both “single family dwellings” and “agricultural use structures” as primary and secondary compatible uses in moderate intensity use, low intensity use, rural use, and resource management areas in the plan {see Executive Law § 805 [3] [d ] [4]; [e] [4]; [¶] [4]; [g] [4]). For the same reasons, the Legislature treated “agricultural use structures” and “single family dwellings” separately in designating class A and B regional projects subject to Agency jurisdiction (Executive Law § 810), and exempted the former from Agency jurisdiction triggered solely by the structure being “in excess of forty feet in height” in all but industrial use areas (Executive Law § 810 [1] [a] [4]; [b] [5]; [c] [5]; [d] [5]; [e] [8]). *583 Clearly, not all lands classified as resource management under the APA Act are used for agricultural purposes (see Executive Law § 805 [3] [g]), and a project involving a single-family dwelling on nonagricultural land would not qualify as an “agricultural use structure” and therefore would be subject to Agency jurisdiction perhaps as a class A project (Executive Law § 810 [1] [e]) or as a class B project in the absence of an approved local land use program (Executive Law § 810 [2] [d]). Such projects would be far more prevalent, necessitating separate references to “agricultural use structures” and “single family dwellings” throughout the APA Act to insure Agency jurisdiction over the latter. Finally, by determining that “all agricultural use structures and single family dwellings or mobile homes occupied by a farmer of land in agricultural use, his employees engaged in such use and members of their respective immediate families, will together constitute and count as a single principal building” (Executive Law § 802 [50] [g]), the Legislature recognized an exception for farm land from the general statutory rule that each “single family dwelling” or “mobile home” “constitutes one principal building” (Executive Law § 802 [50] [a]-[b]). By specifically designating all “agricultural use structures,” “single family dwellings” and “mobile homes” on farm property as “one principal building,” the Legislature made clear its intent that all such structures situate on agricultural lands be treated as one and the same under the APA Act.
For the foregoing reasons, Lewis Family Farm, Inc. is entitled to judgment pursuant to CPLR 7806 annulling the Agency’s March 25, 2008 determination on the ground that it was affected by an error of law, as well as to summary judgment dismissing the Agency’s amended complaint dated May 14, 2008 and all causes of action therein. Also, this court’s April 11, 2008 order granting a partial stay is vacated as moot.